**ORAL ARGUMENT NOT YET SCHEDULED**

————————

**No. 14-1277**

————————

**UNITED STATES COURT OF APPEALS**
**DISTRICT OF COLUMBIA CIRCUIT**

————————

**JEFFREY SWATERS,**
**Petitioner,**

**v.**

**UNITED STATES**
**DEPARTMENT OF TRANSPORTATION,**
**Respondent.**

————————

**On Petition for Review of A Final Decision and Order**
**Of The United States Department of Transportation**

————————

**ADDENDUM TO INITIAL BRIEF OF THE PETITIONER**

————————

Tony B. Jobe
Law Offices of Tony B. Jobe
11705 Triple Notch Terrace
Richmond, VA  23233
P. O. Box 1430
Madisonville, LA  70447
Telephone:  (985) 845 – 8088
Counsel for Petitioner, Jeffrey Swaters

# TABLE OF CONTENTS

**Page**

49 U.S.C. § 46110 ..................................................................................1

5 U.S.C. § 701 – 706 ..............................................................................2

49 U.S.C. § 801 ......................................................................................4

The Omnibus Transportation Employee Testing Act of 1991 ..................5

49 U.S.C. §§ 5330 – 5331 .....................................................................12

49 C.F.R. § 40.5 ...................................................................................15

5 U.S.C. § 551 ......................................................................................16

49 C.F.R. § 40 ......................................................................................17

*Drug Testing: Undercover Tests Reveal Significant Vulnerabilities in DOT's Drug Testing Program* ...............................................................27

14 C.F.R. § 120.109 .............................................................................28

49 C.F.R. § 40.331 ...............................................................................29

Declaration of Tony B. Jobe
     sworn August 21, 2015 .................................................................30

Declaration of Nancy E. Hamilton
     sworn August 19, 2015 .................................................................32

49 C.F.R. § 40.331 ...............................................................................35

Order Denying Defendant's Objection to
Plaintiff's Notice of Production from Non-Party and
Motion to Quash Supoena Duces Tecum of
The Honorable John J. Murphy, III
     filed October 10, 2011 .................................................................36

49 C.F.R. § 40.13 .................................................................................37

49 C.F.R. § 40.27 .................................................................................38

49 C.F.R. § 40.99 .................................................................................39

14 C.F.R. § 91.17 .................................................................................40

14 C.F.R. § 121 ....................................................................................41

49 C.F.R. § 821.31 ...............................................................................42

49 C.F.R. § 821.40 ...............................................................................43

49 U.S.C. § 44709 ................................................................................44

49 C.F.R. § 821.37 ...............................................................................46

49 C.F.R. § 821.50 ...............................................................................47

49 C.F.R. § 821.52 ...............................................................................48

49 U.S.C. § 1133 ..................................................................................49

49 U.S.C. § 1134 ..................................................................................50

49 U.S.C. § 1153 ..................................................................................51

Flowchart of Legal Processes ..............................................................53

Descriptions of Some Forensic Science Disciplines ...............................54

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 46108 .......... | 49 App.:1487(a) (related to party in interest). | Aug. 23, 1958, Pub. L. 85–726, §1007(a) (related to party in interest), 72 Stat. 796. |

The words "interested person" are substituted for "party in interest" for consistency. The words "may bring a civil action" are substituted for "may apply" for consistency in the revised title and with other titles of the United States Code and rule 2 of the Federal Rules of Civil Procedure (28 App. U.S.C.). The text of 49 App.:1487(a) (words after semicolon related to party in interest) is omitted as surplus because of 28:1651 and rule 81(b) of the Federal Rules of Civil Procedure.

## § 46109. Joinder and intervention

A person interested in or affected by a matter under consideration in a proceeding before the Secretary of Transportation or civil action to enforce this part or a requirement or regulation prescribed, or an order or any term of a certificate or permit issued, under this part may be joined as a party or permitted to intervene in the proceeding or civil action.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1230.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 46109 .......... | 49 App.:1489. | Aug. 23, 1958, Pub. L. 85–726, §1009, 72 Stat. 796. |
| | 49 App.:1551(b)(1)(E). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §1601(b)(1)(E); added Oct. 4, 1984, Pub. L. 98–443, §3(e), 98 Stat. 1704. |

The words "proceeding . . . or civil action" are substituted for "proceeding . . . whether such proceedings be instituted . . . or be begun originally in any court of the United States" for consistency in the revised title and with other titles of the United States Code and rule 2 of the Federal Rules of Civil Procedure (28 App. U.S.C.). The words "prescribed . . . issued" are added for consistency in the revised title and with other titles of the Code. The words "condition, or limitation" are omitted as being included in "term". The words "may be joined as a party or permitted to intervene" are substituted for "it shall be lawful to include as parties, or to permit the intervention of" for clarity. The text of 49 App.:1489 (words after semicolon) is omitted as surplus.

## § 46110. Judicial review

(a) FILING AND VENUE.—Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509(f) of this title, a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Under Secretary of Transportation for Security with respect to security duties and powers designated to be carried out by the Under Secretary or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator) in whole or in part under this part, part B, or subsection (l) or (s) of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

(b) JUDICIAL PROCEDURES.—When a petition is filed under subsection (a) of this section, the clerk of the court immediately shall send a copy of the petition to the Secretary, Under Secretary, or Administrator, as appropriate. The Secretary, Under Secretary, or Administrator shall file with the court a record of any proceeding in which the order was issued, as provided in section 2112 of title 28.

(c) AUTHORITY OF COURT.—When the petition is sent to the Secretary, Under Secretary, or Administrator, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Secretary, Under Secretary, or Administrator to conduct further proceedings. After reasonable notice to the Secretary, Under Secretary, or Administrator, the court may grant interim relief by staying the order or taking other appropriate action when good cause for its action exists. Findings of fact by the Secretary, Under Secretary, or Administrator, if supported by substantial evidence, are conclusive.

(d) REQUIREMENT FOR PRIOR OBJECTION.—In reviewing an order under this section, the court may consider an objection to an order of the Secretary, Under Secretary, or Administrator only if the objection was made in the proceeding conducted by the Secretary, Under Secretary, or Administrator or if there was a reasonable ground for not making the objection in the proceeding.

(e) SUPREME COURT REVIEW.—A decision by a court under this section may be reviewed only by the Supreme Court under section 1254 of title 28.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1230; Pub. L. 107–71, title I, §140(b)(1), (2), Nov. 19, 2001, 115 Stat. 641; Pub. L. 108–176, title II, §228, Dec. 12, 2003, 117 Stat. 2532.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 46110(a) ...... | 49 App.:1486(a), (b) (as 1486(a), (b) relates to Secretary and CAB). | Aug. 23, 1958, Pub. L. 85–726, §1006(a), (b), (e), (f) (as §1006(a), (b), (e), (f) relates to Administrator and CAB), 72 Stat. 795. |
| | 49 App.:1551(b)(1)(E). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §1601(b)(1)(E); added Oct. 4, 1984, Pub. L. 98–443, §3(e), 98 Stat. 1704. |
| | 49 App.:1655(c)(1). | Oct. 15, 1966, Pub. L. 89–670, §6(c)(1), 80 Stat. 938; Jan. 12, 1983, Pub. L. 97–449, §7(b), 96 Stat. 2444. |
| 46110(b) ...... | 49 App.:1486(c) (related to Secretary and CAB). | Aug. 23, 1958, Pub. L. 85–726, §1006(c) (related to Administrator and CAB), 72 Stat. 795; restated June 29, 1960, Pub. L. 86–546, §1, 74 Stat. 255. |
| | 49 App.:1551(b)(1)(E). | |
| 46110(c) ...... | 49 App.:1486(d) (related to Secretary and CAB). | Aug. 23, 1958, Pub. L. 85–726, §1006(d) (related to Administrator and CAB), 72 Stat. 795; restated Sept. 13, 1961, Pub. L. 87–225, §2, 75 Stat. 497. |
| | 49 App.:1655(c)(1). | |
| | 49 App.:1486(e) (1st sentence related to Secretary and CAB). | |

resentatives'' for "the committees on the Judiciary of the Senate and the House of Representatives, the Select Committee on Small Business of the Senate, and the Committee on Small Business of the House of Representatives'', was executed by making the substitution for "the Committees on the Judiciary of the Senate and House of Representatives, the Select Committee on Small Business of the Senate, and the Committee on Small Business of the House of Representatives'' to reflect the probable intent of Congress.

Subsec. (b). Pub. L. 104–121, § 243(b)(2), substituted "his or her views with respect to compliance with this chapter, the adequacy of the rulemaking record with respect to small entities and the'' for "his views with respect to the''.

#### CHANGE OF NAME

Committee on Small Business of Senate changed to Committee on Small Business and Entrepreneurship of Senate. See Senate Resolution No. 123, One Hundred Seventh Congress, June 29, 2001.

#### EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–121 effective on expiration of 90 days after Mar. 29, 1996, but inapplicable to interpretative rules for which a notice of proposed rulemaking was published prior to Mar. 29, 1996, see section 245 of Pub. L. 104–121, set out as a note under section 601 of this title.

## CHAPTER 7—JUDICIAL REVIEW

Sec.
701.    Application; definitions.
702.    Right of review.
703.    Form and venue of proceeding.
704.    Actions reviewable.
705.    Relief pending review.
706.    Scope of review.

#### SHORT TITLE

The provisions of sections 551 to 559 of this title and this chapter were originally enacted by act June 11, 1946, ch. 423, 60 Stat. 237, popularly known as the "Administrative Procedure Act''. That Act was repealed as part of the general revision of this title by Pub. L. 89–554 and its provisions incorporated into sections 551 to 559 of this title and this chapter.

### § 701. Application; definitions

(a) This chapter applies, according to the provisions thereof, except to the extent that—
(1) statutes preclude judicial review;
(2) agency action is committed to agency discretion by law.

(b) For the purpose of this chapter—
(1) "agency'' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—
(A) the Congress;
(B) the courts of the United States;
(C) the governments of the territories or possessions of the United States;
(D) the government of the District of Columbia;
(E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;
(F) courts martial and military commissions;
(G) military authority exercised in the field in time of war or in occupied territory; or

(H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix; and

(2) "person'', "rule'', "order'', "license'', "sanction'', "relief'', and "agency action'' have the meanings given them by section 551 of this title.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 103–272, § 5(a), July 5, 1994, 108 Stat. 1373; Pub. L. 111–350, § 5(a)(3), Jan. 4, 2011, 124 Stat. 3841.)

#### HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
| --- | --- | --- |
| (a) ............. | 5 U.S.C. 1009 (introductory clause). | June 11, 1946, ch. 324, § 10 (introductory clause), 60 Stat. 243. |

In subsection (a), the words "This chapter applies, according to the provisions thereof.'' are added to avoid the necessity of repeating the introductory clause of former section 1009 in sections 702–706.

Subsection (b) is added on authority of section 2 of the Act of June 11, 1946, ch. 324, 60 Stat. 237, as amended, which is carried into section 551 of this title.

In subsection (b)(1)(G), the words "or naval'' are omitted as included in "military''.

In subsection (b)(1)(H), the words "functions which by law expire on the termination of present hostilities, within any fixed period thereafter, or before July 1, 1947'' are omitted as executed. Reference to the "Selective Training and Service Act of 1940'' is omitted as that Act expired on Mar. 31, 1947. Reference to the "Sugar Control Extension Act of 1947'' is omitted as that Act expired on Mar. 31, 1948. References to the "Housing and Rent Act of 1947, as amended'' and the "Veterans' Emergency Housing Act of 1946'' have been consolidated as they are related. The reference to former section 1641(b)(2) of title 50, appendix, is retained notwithstanding its repeal by § 111(a)(1) of the Act of Sept. 21, 1961, Pub. L. 87–256, 75 Stat. 538, since § 111(c) of the Act provides that a reference in other Acts to a provision of law repealed by § 111(a) shall be considered to be a reference to the appropriate provisions of Pub. L. 87–256.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

#### REFERENCES IN TEXT

Sections 1891–1902 of title 50, appendix, referred to in subsec. (b)(1)(H), were omitted from the Code as executed.

#### AMENDMENTS

2011—Subsec. (b)(1)(H). Pub. L. 111–350 struck out "chapter 2 of title 41;'' after "title 12;''.
1994—Subsec. (b)(1)(H). Pub. L. 103–272 substituted "subchapter II of chapter 471 of title 49; or sections'' for "or sections 1622,''.

### § 702. Right of review

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be

denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, § 10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

§ 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, § 1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, § 10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

§ 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, § 10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

§ 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, § 10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, § 10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801. Congressional review.
802. Congressional disapproval procedure.
803. Special rule on statutory, regulatory, and judicial deadlines.
804. Definitions.
805. Judicial review.
806. Applicability; severability.
807. Exemption for monetary policy.
808. Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a

PUBLIC LAW 102-143—OCT. 28, 1991          105 STAT. 917

Public Law 102-143
102d Congress

## An Act

Making appropriations for the Department of Transportation and related agencies for the fiscal year ending September 30, 1992, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the Department of Transportation and related agencies for the fiscal year ending September 30, 1992, and for other purposes, namely:

Oct. 28, 1991
[H.R. 2942]

Department of
Transportation
and Related
Agencies
Appropriations
Act, 1992.

### TITLE I—DEPARTMENT OF TRANSPORTATION

#### OFFICE OF THE SECRETARY

##### IMMEDIATE OFFICE OF THE SECRETARY

For necessary expenses of the Immediate Office of the Secretary, $1,435,000.

##### IMMEDIATE OFFICE OF THE DEPUTY SECRETARY

For necessary expenses of the Immediate Office of the Deputy Secretary, $550,000.

##### OFFICE OF THE GENERAL COUNSEL

For necessary expenses of the Office of the General Counsel, $7,000,000.

##### OFFICE OF THE ASSISTANT SECRETARY FOR POLICY AND INTERNATIONAL AFFAIRS

For necessary expenses of the Office of the Assistant Secretary for Policy and International Affairs, $8,733,000.

##### OFFICE OF THE ASSISTANT SECRETARY FOR BUDGET AND PROGRAMS

For necessary expenses of the Office of the Assistant Secretary for Budget and Programs, $2,726,000, including not to exceed $40,000 for allocation within the Department of official reception and representation expenses as the Secretary may determine.

##### OFFICE OF THE ASSISTANT SECRETARY FOR GOVERNMENTAL AFFAIRS

For necessary expenses of the Office of the Assistant Secretary for Governmental Affairs, $2,320,000.

Addendum p. 5

105 STAT. 952          PUBLIC LAW 102–143—OCT. 28, 1991

## TITLE V—OMNIBUS TRANSPORTATION EMPLOYEE TESTING

Omnibus
Transportation
Employee
Testing Act of
1991.
Drugs and drug
abuse.
Safety.
49 USC app.
1301 note.
49 USC app.
1434 note.

### SHORT TITLE

SEC. 1. This title may be cited as the "Omnibus Transportation Employee Testing Act of 1991".

### FINDINGS

SEC. 2. The Congress finds that—
(1) alcohol abuse and illegal drug use pose significant dangers to the safety and welfare of the Nation;

PUBLIC LAW 102–143—OCT. 28, 1991          105 STAT. 953

(2) millions of the Nation's citizens utilize transportation by aircraft, railroads, trucks, and buses, and depend on the operators of aircraft, trains, trucks, and buses to perform in a safe and responsible manner;

(3) the greatest efforts must be expended to eliminate the abuse of alcohol and use of illegal drugs, whether on duty or off duty, by those individuals who are involved in the operation of aircraft, trains, trucks, and buses;

(4) the use of alcohol and illegal drugs has been demonstrated to affect significantly the performance of individuals, and has been proven to have been a critical factor in transportation accidents;

(5) the testing of uniformed personnel of the Armed Forces has shown that the most effective deterrent to abuse of alcohol and use of illegal drugs is increased testing, including random testing;

(6) adequate safeguards can be implemented to ensure that testing for abuse of alcohol or use of illegal drugs is performed in a manner which protects an individual's right of privacy, ensures that no individual is harassed by being treated differently from other individuals, and ensures that no individual's reputation or career development is unduly threatened or harmed; and

(7) rehabilitation is a critical component of any testing program for abuse of alcohol or use of illegal drugs, and should be made available to individuals, as appropriate.

### TESTING TO ENHANCE AVIATION SAFETY

SEC. 3. (a) Title VI of the Federal Aviation Act of 1958 (49 App. U.S.C. 1421 et seq.) is amended by adding at the end thereof the following:

"SEC. 614. ALCOHOL AND CONTROLLED SUBSTANCES TESTING.                     49 USC app. 1434.

"(a) TESTING PROGRAM.—

"(1) PROGRAM FOR EMPLOYEES OF CARRIERS.—The Adminis-      Regulations.
trator shall, in the interest of aviation safety, prescribe regulations within 12 months after the date of enactment of this section. Such regulations shall establish a program which requires air carriers and foreign air carriers to conduct preemployment, reasonable suspicion, random, and post-accident testing of airmen, crewmembers, airport security screening contract personnel, and other air carrier employees responsible for safety-sensitive functions (as determined by the Administrator) for use, in violation of law or Federal regulation, of alcohol or a controlled substance. The Administrator may also prescribe regulations, as the Administrator considers appropriate in the interest of safety, for the conduct of periodic recurring testing of such employees for such use in violation of law or Federal regulation.

"(2) PROGRAM FOR FAA EMPLOYEES.—The Administrator shall establish a program applicable to employees of the Federal Aviation Administration whose duties include responsibility for safety-sensitive functions. Such program shall provide for preemployment, reasonable suspicion, random, and post-accident testing for use, in violation of law or Federal regulation, of alcohol or a controlled substance. The Administrator may

also prescribe regulations, as the Administrator considers appropriate in the interest of safety, for the conduct of periodic recurring testing of such employees for such use in violation of law or Federal regulation.

"(3) SUSPENSION; REVOCATION; DISMISSAL.—In prescribing regulations under the programs required by this subsection, the Administrator shall require, as the Administrator considers appropriate, the suspension or revocation of any certificate issued to such an individual, or the disqualification or dismissal of any such individual, in accordance with the provisions of this section, in any instance where a test conducted and confirmed under this section indicates that such individual has used, in violation of law or Federal regulation, alcohol or a controlled substance.

"(b) PROHIBITION ON SERVICE.—

"(1) PROHIBITED ACT.—It is unlawful for a person to use, in violation of law or Federal regulation, alcohol or a controlled substance after the date of enactment of this section and serve as an airman, crewmember, airport security screening contract personnel, air carrier employee responsible for safety-sensitive functions (as determined by the Administrator), or employee of the Federal Aviation Administration with responsibility for safety-sensitive functions.

"(2) EFFECT OF REHABILITATION.—No individual who is determined to have used, in violation of law or Federal regulation, alcohol or a controlled substance after the date of enactment of this section shall serve as an airman, crewmember, airport security screening contract personnel, air carrier employee responsible for safety-sensitive functions (as determined by the Administrator), or employee of the Federal Aviation Administration with responsibility for safety-sensitive functions unless such individual has completed a program of rehabilitation described in subsection (c) of this section.

"(3) PERFORMANCE OF PRIOR DUTIES PROHIBITED.—Any such individual determined by the Administrator to have used, in violation of law or Federal regulation, alcohol or a controlled substance after the date of enactment of this section who—

"(A) engaged in such use while on duty;

"(B) prior to such use had undertaken or completed a rehabilitation program described in subsection (c);

"(C) following such determination refuses to undertake such a rehabilitation program; or

"(D) following such determination fails to complete such a rehabilitation program,

shall not be permitted to perform the duties relating to air transportation which such individual performed prior to the date of such determination.

"(c) PROGRAM FOR REHABILITATION.—

Regulations.

"(1) PROGRAM FOR EMPLOYEES OF CARRIERS.—The Administrator shall prescribe regulations setting forth requirements for rehabilitation programs which at a minimum provide for the identification and opportunity for treatment of employees referred to in subsection (a)(1) in need of assistance in resolving problems with the use, in violation of law or Federal regulation, of alcohol or controlled substances. Each air carrier and foreign air carrier is encouraged to make such a program available to all of its employees in addition to those employees referred to in

subsection (a)(1). The Administrator shall determine the circumstances under which such employees shall be required to participate in such a program. Nothing in this subsection shall preclude any air carrier or foreign air carrier from establishing a program under this subsection in cooperation with any other air carrier or foreign air carrier.

"(2) PROGRAM FOR FAA EMPLOYEES.—The Administrator shall establish and maintain a rehabilitation program which at a minimum provides for the identification and opportunity for treatment of those employees of the Federal Aviation Administration whose duties include responsibility for safety-sensitive functions who are in need of assistance in resolving problems with the use of alcohol or controlled substances.

"(d) PROCEDURES FOR TESTING.—In establishing the program required under subsection (a), the Administrator shall develop requirements which shall—

"(1) promote, to the maximum extent practicable, individual privacy in the collection of specimen samples;

"(2) with respect to laboratories and testing procedures for controlled substances, incorporate the Department of Health and Human Services scientific and technical guidelines dated April 11, 1988, and any subsequent amendments thereto, including mandatory guidelines which—

"(A) establish comprehensive standards for all aspects of laboratory controlled substances testing and laboratory procedures to be applied in carrying out this section, including standards which require the use of the best available technology for ensuring the full reliability and accuracy of controlled substances tests and strict procedures governing the chain of custody of specimen samples collected for controlled substances testing;

"(B) establish the minimum list of controlled substances for which individuals may be tested; and

"(C) establish appropriate standards and procedures for periodic review of laboratories and criteria for certification and revocation of certification of laboratories to perform controlled substances testing in carrying out this section;

"(3) require that all laboratories involved in the controlled substances testing of any individual under this section shall have the capability and facility, at such laboratory, of performing screening and confirmation tests;

"(4) provide that all tests which indicate the use, in violation of law or Federal regulation, of alcohol or a controlled substance by any individual shall be confirmed by a scientifically recognized method of testing capable of providing quantitative data regarding alcohol or a controlled substance;

"(5) provide that each specimen sample be subdivided, secured, and labelled in the presence of the tested individual and that a portion thereof be retained in a secure manner to prevent the possibility of tampering, so that in the event the individual's confirmation test results are positive the individual has an opportunity to have the retained portion assayed by a confirmation test done independently at a second certified laboratory if the individual requests the independent test within 3 days after being advised of the results of the confirmation test;

"(6) ensure appropriate safeguards for testing to detect and quantify alcohol in breath and body fluid samples, including

urine and blood, through the development of regulations as may be necessary and in consultation with the Department of Health and Human Services;

"(7) provide for the confidentiality of test results and medical information (other than information relating to alcohol or a controlled substance) of employees, except that the provisions of this paragraph shall not preclude the use of test results for the orderly imposition of appropriate sanctions under this section; and

"(8) ensure that employees are selected for tests by nondiscriminatory and impartial methods, so that no employee is harassed by being treated differently from other employees in similar circumstances.

"(e) EFFECT ON OTHER LAWS AND REGULATIONS.—

"(1) STATE AND LOCAL LAW AND REGULATIONS.—No State or local government shall adopt or have in effect any law, rule, regulation, ordinance, standard, or order that is inconsistent with the regulations promulgated under this section, except that the regulations promulgated under this section shall not be construed to preempt provisions of State criminal law which impose sanctions for reckless conduct leading to actual loss of life, injury, or damage to property, whether the provisions apply specifically to employees of an air carrier or foreign air carrier, or to the general public.

"(2) OTHER REGULATIONS ISSUED BY ADMINISTRATOR.—Nothing in this section shall be construed to restrict the discretion of the Administrator to continue in force, amend, or further supplement any regulations issued before the date of enactment of this section that govern the use of alcohol and controlled substances by airmen, crewmembers, airport security screening contract personnel, air carrier employees responsible for safety-sensitive functions (as determined by the Administrator), or employees of the Federal Aviation Administration with responsibility for safety-sensitive functions.

"(3) INTERNATIONAL OBLIGATIONS.—In prescribing regulations under this section, the Administrator shall only establish requirements applicable to foreign air carriers that are consistent with the international obligations of the United States, and the Administrator shall take into consideration any applicable laws and regulations of foreign countries. The Secretary of State and the Secretary of Transportation, jointly, shall call on the member countries of the International Civil Aviation Organization to strengthen and enforce existing standards to prohibit the use, in violation of law or Federal regulation, of alcohol or a controlled substance by crew members in international civil aviation.

"(f) DEFINITION.—For the purposes of this section, the term 'controlled substance' means any substance under section 102(6) of the Controlled Substances Act (21 U.S.C. 802(6)) specified by the Administrator.".

(b) That portion of the table of contents of the Federal Aviation Act of 1958 relating to title VI is amended by adding at the end thereof the following:

"Sec. 614. Alcohol and controlled substances testing.
    "(a) Testing program.
    "(b) Prohibition on service.
    "(c) Program for rehabilitation.

PUBLIC LAW 102–143—OCT. 28, 1991        105 STAT. 957

"(d) Procedures.
"(e) Effect on other laws and regulations.
"(f) Definition.".

### TESTING TO ENHANCE RAILROAD SAFETY

Sec. 4. Section 202 of the Federal Railroad Safety Act of 1970 (45 U.S.C. 431) is amended by adding at the end thereof the following:

"(r)(1) In the interest of safety, the Secretary shall, within twelve months after the date of enactment of this subsection, issue rules, regulations, standards, and orders relating to alcohol and drug use in railroad operations. Such regulations shall establish a program which— *[margin: Regulations.]*

"(A) requires railroads to conduct preemployment, reasonable suspicion, random, and post-accident testing of all railroad employees responsible for safety-sensitive functions (as determined by the Secretary) for use, in violation of law or Federal regulation, of alcohol or a controlled substance;

"(B) requires, as the Secretary considers appropriate, disqualification for an established period of time or dismissal of any employee determined to have used or to have been impaired by alcohol while on duty; and

"(C) requires, as the Secretary considers appropriate, disqualification for an established period of time or dismissal of any employee determined to have used a controlled substance, whether on duty or not on duty, except as permitted for medical purposes by law and any rules, regulations, standards, or orders issued under this title.

The Secretary may also issue rules, regulations, standards, and orders, as the Secretary considers appropriate in the interest of safety, requiring railroads to conduct periodic recurring testing of railroad employees responsible for such safety sensitive functions, for use of alcohol or a controlled substance in violation of law or Federal regulation. Nothing in this subsection shall be construed to restrict the discretion of the Secretary to continue in force, amend, or further supplement any rules, regulations, standards, and orders governing the use of alcohol and controlled substances in railroad operations issued before the date of enactment of this subsection.

"(2) In carrying out the provisions of this subsection, the Secretary shall develop requirements which shall—

"(A) promote, to the maximum extent practicable, individual privacy in the collection of specimen samples;

"(B) with respect to laboratories and testing procedures for controlled substances, incorporate the Department of Health and Human Services scientific and technical guidelines dated April 11, 1988, and any subsequent amendments thereto, including mandatory guidelines which—

"(i) establish comprehensive standards for all aspects of laboratory controlled substances testing and laboratory procedures to be applied in carrying out this subsection, including standards which require the use of the best available technology for ensuring the full reliability and accuracy of controlled substances tests and strict procedures governing the chain of custody of specimen samples collected for controlled substances testing;

"(ii) establish the minimum list of controlled substances for which individuals may be tested; and

Addendum p. 11

vestigations of safety hazards and security risks for provisions relating to investigation of safety hazards.

## § 5330. State safety oversight

(a) APPLICATION.—This section shall only apply to—

(1) States that have rail fixed guideway public transportation systems that are not subject to regulation by the Federal Railroad Administration; and

(2) States that are designing rail fixed guideway public transportation systems that will not be subject to regulation by the Federal Railroad Administration.

(b) GENERAL AUTHORITY.—The Secretary of Transportation may withhold not more than 5 percent of the amount required to be appropriated for use in a State or urbanized area in the State under section 5307 of this title for a fiscal year beginning after September 30, 1994, if the State in the prior fiscal year has not met the requirements of subsection (c) of this section and the Secretary decides the State is not making an adequate effort to comply with subsection (c).

(c) STATE REQUIREMENTS.—A State meets the requirements of this section if the State—

(1) establishes and is carrying out a safety program plan for each fixed guideway public transportation system in the State that establishes at least safety requirements, lines of authority, levels of responsibility and accountability, and methods of documentation for the system; and

(2) designates a State authority as having responsibility—

(A) to require, review, approve, and monitor the carrying out of each plan;

(B) to investigate hazardous conditions and accidents on the systems; and

(C) to require corrective action to correct or eliminate those conditions.

(d) MULTISTATE INVOLVEMENT.—When more than one State is subject to this section in connection with a single public transportation authority, the affected States shall ensure uniform safety standards and enforcement or shall designate an entity (except the public transportation authority) to ensure uniform safety standards and enforcement and to meet the requirements of subsection (c) of this section.

(e) AVAILABILITY OF WITHHELD AMOUNTS.—(1) An amount withheld under subsection (b) of this section remains available for apportionment for use in the State until the end of the 2d fiscal year after the fiscal year for which the amount may be appropriated.

(2) If a State meets the requirements of subsection (c) of this section before the last day of the period for which an amount withheld under subsection (b) of this section remains available under paragraph (1) of this subsection, the Secretary, on the first day on which the State meets the requirements, shall apportion to the State the amount withheld that remains available for apportionment for use in the State. An amount apportioned under this paragraph remains available until the end of the 3d fiscal year after the fiscal year in which the amount is apportioned. An amount not obligated at the end of the 3-year period shall be apportioned for use in other States under section 5336 of this title.

(3) If a State does not meet the requirements of subsection (c) of this section at the end of the period for which an amount withheld under subsection (b) of this section remains available under paragraph (1) of this subsection, the amount shall be apportioned for use in other States under section 5336 of this title.

(Pub. L. 103–272, §1(d), July 5, 1994, 108 Stat. 831; Pub. L. 109–59, title III, §§3002(b)(4), 3029(a), Aug. 10, 2005, 119 Stat. 1545, 1625.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 5330(a) ........ | 49 App.:1624(d). | July 9, 1964, Pub. L. 88–365, 78 Stat. 302, §28; added Dec. 18, 1991, Pub. L. 102–240, §3029, 105 Stat. 2116. |
| 5330(b) ........ | 49 App.:1624(a). | |
| 5330(c) ........ | 49 App.:1624(b)(1), (2). | |
| 5330(d) ........ | 49 App.:1624(b)(3). | |
| 5330(e) ........ | 49 App.:1624(c). | |
| 5330(f) ........ | 49 App.:1624(e). | |

In subsection (e)(1), the words "under subsection (a) of this section from apportionment for use in any State in a fiscal year" are omitted as surplus.

In subsection (e)(2) and (3), the words "from apportionment" and "for apportionment for use in a State" are omitted as surplus.

AMENDMENTS

2005—Pub. L. 109–59, §3029(a)(1), substituted "State safety oversight" for "Withholding amounts for noncompliance with safety requirements" in section catchline.

Subsec. (a). Pub. L. 109–59, §3029(a)(1), added subsec. (a) and struck out heading and text of former subsec. (a). Text read as follows: "This section applies only to States that have rail fixed guideway mass transportation systems not subject to regulation by the Federal Railroad Administration."

Subsec. (c)(1). Pub. L. 109–59, §3002(b)(4), substituted "public transportation" for "mass transportation".

Subsec. (d). Pub. L. 109–59, §3029(a)(2), substituted "shall ensure uniform safety standards and enforcement or shall designate" for "may designate".

Pub. L. 109–59, §3002(b)(4), substituted "public transportation" for "mass transportation" in two places.

Subsec. (f). Pub. L. 109–59, §3029(a)(3), struck out heading and text of subsec. (f). Text read as follows: "Not later than December 18, 1992, the Secretary shall prescribe regulations stating the requirements for complying with subsection (c) of this section."

## § 5331. Alcohol and controlled substances testing

(a) DEFINITIONS.—In this section—

(1) "controlled substance" means any substance under section 102 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 802) whose use the Secretary of Transportation decides has a risk to transportation safety.

(2) "person" includes any entity organized or existing under the laws of the United States, a State, territory, or possession of the United States, or a foreign country.

(3) "public transportation" means any form of public transportation, except a form the Secretary decides is covered adequately, for employee alcohol and controlled substances testing purposes, under section 20140 or 31306

of this title or section 2303a, 7101(i), or 7302(e) of title 46. The Secretary may also decide that a form of public transportation is covered adequately, for employee alcohol and controlled substances testing purposes, under the alcohol and controlled substance statutes or regulations of an agency within the Department of Transportation or the Coast Guard.

(b) TESTING PROGRAM FOR PUBLIC TRANSPORTATION EMPLOYEES.—(1)(A) In the interest of public transportation safety, the Secretary shall prescribe regulations that establish a program requiring public transportation operations that receive financial assistance under section 5307, 5309, or 5311 of this title to conduct preemployment, reasonable suspicion, random, and post-accident testing of public transportation employees responsible for safety-sensitive functions (as decided by the Secretary) for the use of a controlled substance in violation of law or a United States Government regulation, and to conduct reasonable suspicion, random, and post-accident testing of such employees for the use of alcohol in violation of law or a United States Government regulation. The regulations shall permit such operations to conduct preemployment testing of such employees for the use of alcohol.

(B) When the Secretary of Transportation considers it appropriate in the interest of safety, the Secretary may prescribe regulations for conducting periodic recurring testing of public transportation employees responsible for safety-sensitive functions (as decided by the Secretary) for the use of alcohol or a controlled substance in violation of law or a Government regulation.

(2) In prescribing regulations under this subsection, the Secretary of Transportation—

(A) shall require that post-accident testing of such a public transportation employee be conducted when loss of human life occurs in an accident involving public transportation; and

(B) may require that post-accident testing of such a public transportation employee be conducted when bodily injury or significant property damage occurs in any other serious accident involving public transportation.

(c) DISQUALIFICATIONS FOR USE.—(1) When the Secretary of Transportation considers it appropriate, the Secretary shall require disqualification for an established period of time or dismissal of any employee referred to in subsection (b)(1) of this section who is found—

(A) to have used or been impaired by alcohol when on duty; or

(B) to have used a controlled substance, whether or not on duty, except as allowed for medical purposes by law or regulation.

(2) This section does not supersede any penalty applicable to a public transportation employee under another law.

(d) TESTING AND LABORATORY REQUIREMENTS.—In carrying out subsection (b) of this section, the Secretary of Transportation shall develop requirements that shall—

(1) promote, to the maximum extent practicable, individual privacy in the collection of specimens;

(2) for laboratories and testing procedures for controlled substances, incorporate the De-

partment of Health and Human Services scientific and technical guidelines dated April 11, 1988, and any amendments to those guidelines, including mandatory guidelines establishing—

(A) comprehensive standards for every aspect of laboratory controlled substances testing and laboratory procedures to be applied in carrying out this section, including standards requiring the use of the best available technology to ensure the complete reliability and accuracy of controlled substances tests and strict procedures governing the chain of custody of specimens collected for controlled substances testing;

(B) the minimum list of controlled substances for which individuals may be tested; and

(C) appropriate standards and procedures for periodic review of laboratories and criteria for certification and revocation of certification of laboratories to perform controlled substances testing in carrying out this section;

(3) require that a laboratory involved in controlled substances testing under this section have the capability and facility, at the laboratory, of performing screening and confirmation tests;

(4) provide that all tests indicating the use of alcohol or a controlled substance in violation of law or a Government regulation be confirmed by a scientifically recognized method of testing capable of providing quantitative information about alcohol or a controlled substance;

(5) provide that each specimen be subdivided, secured, and labeled in the presence of the tested individual and that a part of the specimen be retained in a secure manner to prevent the possibility of tampering, so that if the individual's confirmation test results are positive the individual has an opportunity to have the retained part tested by a 2d confirmation test done independently at another certified laboratory if the individual requests the 2d confirmation test not later than 3 days after being advised of the results of the first confirmation test;

(6) ensure appropriate safeguards for testing to detect and quantify alcohol in breath and body fluid samples, including urine and blood, through the development of regulations that may be necessary and in consultation with the Secretary of Health and Human Services;

(7) provide for the confidentiality of test results and medical information (except information about alcohol or a controlled substance) of employees, except that this clause does not prevent the use of test results for the orderly imposition of appropriate sanctions under this section; and

(8) ensure that employees are selected for tests by nondiscriminatory and impartial methods, so that no employee is harassed by being treated differently from other employees in similar circumstances.

(e) REHABILITATION.—The Secretary of Transportation shall prescribe regulations establishing requirements for rehabilitation programs that provide for the identification and oppor-

tunity for treatment of any public transportation employee referred to in subsection (b)(1) of this section who is found to have used alcohol or a controlled substance in violation of law or a Government regulation. The Secretary shall decide on the circumstances under which employees shall be required to participate in a program. This subsection does not prevent a public transportation operation from establishing a program under this section in cooperation with another public transportation operation.

(f) RELATIONSHIP TO OTHER LAWS, REGULATIONS, STANDARDS, AND ORDERS.—(1) A State or local government may not prescribe, issue, or continue in effect a law, regulation, standard, or order that is inconsistent with regulations prescribed under this section. However, a regulation prescribed under this section does not preempt a State criminal law that imposes sanctions for reckless conduct leading to loss of life, injury, or damage to property.

(2) In prescribing regulations under this section, the Secretary of Transportation—

(A) shall establish only requirements that are consistent with international obligations of the United States; and

(B) shall consider applicable laws and regulations of foreign countries.

(g) INELIGIBILITY FOR ASSISTANCE.—A person is not eligible for financial assistance under section 5307, 5309, or 5311 of this title if the person is required, under regulations the Secretary of Transportation prescribes under this section, to establish a program of alcohol and controlled substances testing and does not establish the program.

(Pub. L. 103–272, §1(d), July 5, 1994, 108 Stat. 832; Pub. L. 103–429, §6(13), Oct. 31, 1994, 108 Stat. 4379; Pub. L. 104–59, title III, §342(a), Nov. 28, 1995, 109 Stat. 608; Pub. L. 109–59, title III, §§3002(b)(3), (4), 3030, Aug. 10, 2005, 119 Stat. 1545, 1625.)

HISTORICAL AND REVISION NOTES
PUB. L. 103–272

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
| --- | --- | --- |
| 5331(a) ........ | 49 App.:1618a(a). | Oct. 28, 1991, Pub. L. 102–143, §6, 105 Stat. 962. |
| 5331(b) ........ | 49 App.:1618a(b). | |
| 5331(c) ........ | 49 App.:1618a(f). | |
| 5331(d) ........ | 49 App.:1618a(d). | |
| 5331(e) ........ | 49 App.:1618a(c). | |
| 5331(f) ........ | 49 App.:1618a(e). | |
| 5331(g) ........ | 49 App.:1618a(g). | |

In subsection (a), before clause (1), the text of 49 App.:1618a(a)(3) is omitted as surplus because the complete name of the Secretary of Transportation is used the first time the term appears in a section. In clause (3), the words "controlled substances" are substituted for "drug" for consistency in this section.

In subsection (b)(1)(B), the word "also" is omitted as surplus.

In subsection (b)(2)(B), the words "may require" are substituted for "as determined by the Secretary" for clarity and to eliminate unnecessary words.

In subsection (d), the word "samples" is omitted as surplus.

In subsection (d)(2), before subclause (A), the word "subsequent" is omitted as surplus.

In subsection (d)(3), the words "of any individual" are omitted as surplus.

In subsection (d)(4), the words "by any individual" are omitted as surplus.

In subsection (d)(5), the word "tested" is substituted for "assayed" for consistency. The words "2d confirmation test" are substituted for "independent test" for clarity and consistency.

In subsection (d)(6), the word "Secretary" is substituted for "Department" for consistency in the revised title and with other titles of the United States Code.

In subsection (f)(1), the word "prescribe" is substituted for "adopt" for consistency in the revised title and with other titles of the Code. The word "rule" is omitted as being synonymous with "regulation". The word "ordinance" is omitted as being included in "law" and "regulation". The words "whether the provisions apply specifically to mass transportation employees, or to the general public" are omitted as surplus.

In subsection (f)(3), the word "prevent" is substituted for "restrict the discretion of" to eliminate unnecessary words.

In subsection (g) the words "in accordance with such regulations" are omitted as surplus.

PUB. L. 103–429

This amends 49:5331(a)(3) to correct an erroneous cross-reference.

AMENDMENTS

2005—Subsec. (a)(3). Pub. L. 109–59, §3030(a), substituted "section 20140 or 31306 of this title or section 2303a, 7101(i), or 7302(e) of title 46" for "section 20140 or 31306 of this title" and inserted at end "The Secretary may also decide that a form of public transportation is covered adequately, for employee alcohol and controlled substances testing purposes, under the alcohol and controlled substance statutes or regulations of an agency within the Department of Transportation or the Coast Guard.".

Pub. L. 109–59, §3002(b)(4), substituted "public transportation" for "mass transportation" in two places.

Subsec. (b). Pub. L. 109–59, §3002(b)(3), substituted "Public" for "Mass" in heading.

Subsec. (b)(1)(A). Pub. L. 109–59, §3030(b), struck out "or section 103(e)(4) of title 23" after "5311 of this title".

Pub. L. 109–59, §3002(b)(4), substituted "public transportation" for "mass transportation" wherever appearing.

Subsecs. (b)(1)(B), (2), (c)(2), (e). Pub. L. 109–59, §3002(b)(4), substituted "public transportation" for "mass transportation" wherever appearing.

Subsec. (f)(3). Pub. L. 109–59, §3030(c), struck out par. (3) which read as follows: "This section does not prevent the Secretary of Transportation from continuing in effect, amending, or further supplementing a regulation prescribed before October 28, 1991, governing the use of alcohol or a controlled substance by mass transportation employees."

Subsec. (g). Pub. L. 109–59, §3030(b), struck out "or section 103(e)(4) of title 23" after "5311 of this title".

1995—Subsec. (b)(1)(A). Pub. L. 104–59 added subpar. (A) and struck out former subpar. (A) which read as follows: "In the interest of mass transportation safety, the Secretary of Transportation shall prescribe regulations not later than October 28, 1992, that establish a program requiring mass transportation operations that receive financial assistance under section 5307, 5309, or 5311 of this title or section 103(e)(4) of title 23 to conduct preemployment, reasonable suspicion, random, and post-accident testing of mass transportation employees responsible for safety-sensitive functions (as decided by the Secretary) for the use of alcohol or a controlled substance in violation of law or a United States Government regulation."

1994—Subsec. (a)(3). Pub. L. 103–429 substituted "section 20140 or 31306" for "subchapter III of chapter 201 or section 31306".

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–429 effective July 5, 1994, see section 9 of Pub. L. 103–429, set out as a note under section 321 of this title.

## Subpart A - Administrative Provisions

### § 40.5  Who issues authoritative interpretations of this regulation?

ODAPC and the DOT Office of General Counsel (OGC) provide written interpretations of the provisions of this part. These written DOT interpretations are the only official and authoritative interpretations concerning the provisions of this part. DOT agencies may incorporate ODAPC/OGC interpretations in written guidance they issue concerning drug and alcohol testing matters. Only Part 40 interpretations issued after August 1, 2001, are considered valid.

expenses in the same manner as the payment of final judgments as provided in this Act [probably should be "this title", see Short Title note above] would be effective only to the extent and in such amounts as are provided in advance in appropriation Acts, was repealed by Pub. L. 99–80, §4, Aug. 5, 1985, 99 Stat. 186.

## SUBCHAPTER II—ADMINISTRATIVE PROCEDURE

### SHORT TITLE

The provisions of this subchapter and chapter 7 of this title were originally enacted by act June 11, 1946, ch. 324, 60 Stat. 237, popularly known as the "Administrative Procedure Act". That Act was repealed as part of the general revision of this title by Pub. L. 89–554 and its provisions incorporated into this subchapter and chapter 7 hereof.

## § 551. Definitions

For the purpose of this subchapter—

(1) "agency" means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—

  (A) the Congress;

  (B) the courts of the United States;

  (C) the governments of the territories or possessions of the United States;

  (D) the government of the District of Columbia;

or except as to the requirements of section 552 of this title—

  (E) agencies composed of representatives of the parties or of representatives of organizations of the parties to the disputes determined by them;

  (F) courts martial and military commissions;

  (G) military authority exercised in the field in time of war or in occupied territory; or

  (H) functions conferred by sections 1738, 1739, 1743, and 1744 of title 12; subchapter II of chapter 471 of title 49; or sections 1884, 1891–1902, and former section 1641(b)(2), of title 50, appendix;

(2) "person" includes an individual, partnership, corporation, association, or public or private organization other than an agency;

(3) "party" includes a person or agency named or admitted as a party, or properly seeking and entitled as of right to be admitted as a party, in an agency proceeding, and a person or agency admitted by an agency as a party for limited purposes;

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

(5) "rule making" means agency process for formulating, amending, or repealing a rule;

(6) "order" means the whole or a part of a final disposition, whether affirmative, nega-

tive, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

(7) "adjudication" means agency process for the formulation of an order;

(8) "license" includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission;

(9) "licensing" includes agency process respecting the grant, renewal, denial, revocation, suspension, annulment, withdrawal, limitation, amendment, modification, or conditioning of a license;

(10) "sanction" includes the whole or a part of an agency—

  (A) prohibition, requirement, limitation, or other condition affecting the freedom of a person;

  (B) withholding of relief;

  (C) imposition of penalty or fine;

  (D) destruction, taking, seizure, or withholding of property;

  (E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees;

  (F) requirement, revocation, or suspension of a license; or

  (G) taking other compulsory or restrictive action;

(11) "relief" includes the whole or a part of an agency—

  (A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy;

  (B) recognition of a claim, right, immunity, privilege, exemption, or exception; or

  (C) taking of other action on the application or petition of, and beneficial to, a person;

(12) "agency proceeding" means an agency process as defined by paragraphs (5), (7), and (9) of this section;

(13) "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act; and

(14) "ex parte communication" means an oral or written communication not on the public record with respect to which reasonable prior notice to all parties is not given, but it shall not include requests for status reports on any matter or proceeding covered by this subchapter.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 381; Pub. L. 94–409, §4(b), Sept. 13, 1976, 90 Stat. 1247; Pub. L. 103–272, §5(a), July 5, 1994, 108 Stat. 1373; Pub. L. 111–350, §5(a)(2), Jan. 4, 2011, 124 Stat. 3841.)

### HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| (1) ............... | 5 U.S.C. 1001(a). | June 11, 1946, ch. 324, §2(a), 60 Stat. 237. |
| | | Aug. 8, 1946, ch. 870, §302, 60 Stat. 918. |
| | | Aug. 10, 1946, ch. 951, §601, 60 Stat. 993. |
| | | Mar. 31, 1947, ch. 30, §6(a), 61 Stat. 37. |
| | | June 30, 1947, ch. 163, §210, 61 Stat. 201. |

# DEPARTMENT OF TRANSPORTATION

## Office of the Secretary

### 49 CFR Part 40

[Docket OST–99–6578]

RIN 2105–AC49

### Procedures for Transportation Workplace Drug and Alcohol Testing Programs

**AGENCY:** Office of the Secretary, DOT.

**ACTION:** Final rule.

**SUMMARY:** The Department of Transportation is revising its drug and alcohol testing procedures regulation. The purposes of the revision are to make the organization and language of the regulation clearer, to incorporate guidance and interpretations of the rule into its text, and to update the rule to include new provisions responding to changes in technology, the testing industry, and the Department's program.

**EFFECTIVE DATES:** The amendments to the current 49 CFR part 40 are effective January 18, 2001. The revised 49 CFR Part 40 is effective August 1, 2001.

**FOR FURTHER INFORMATION CONTACT:** Robert C. Ashby, Deputy Assistant General Counsel for Regulation and Enforcement, 400 7th Street, SW., Room 10424, Washington DC, 20590, 202–366–9310 (voice), 202–366–9313 (fax), or *bob.ashby@ost.dot.gov* (e-mail); Mary Bernstein, Director, Office of Drug and Alcohol Policy and Compliance (ODAPC), 400 7th Street, SW., Room 10403, Washington DC, 20590, 202–366–3784 (voice), 202–366–3897 (fax), or *mary.bernstein@ost.dot.gov* (e-mail); or Jim L. Swart, Drug and Alcohol Policy Advisor, ODAPC , same address and phone numbers as above, *jim.swart@ost.dot.gov* (e-mail).

**SUPPLEMENTARY INFORMATION:**

## Background

The Department of Transportation first published its drug testing procedures regulation (49 CFR part 40) on November 21, 1988 (53 FR 47002), as an interim final rule. We based the rule on the Department of Health and Human Services (HHS) guidelines for Federal agency employee drug testing, with some changes to fit the transportation workplace. The Department published a final rule responding to comments on the interim rule a year later (54 FR 49854; December 1, 1989).

The Department added alcohol testing procedures to Part 40 in a February 1994 final rule. This rule also made other changes to Part 40, including

requirements for split samples in four operating administration rules. Since that time, the Department has amended specific provisions of Part 40 on various occasions (*e.g.*, with respect to non-evidential alcohol screening devices and "shy bladder" procedures).

In the years since Part 40 was first published, the Department issued a large volume of guidance and over 100 written interpretations, as well as a significant amount of informal advice. Most of this material has not previously been incorporated into the rule text. There have been changes in testing technology, the structure of the drug and alcohol testing business, and the functioning of the Department's drug and alcohol testing programs that make it desirable to update our regulatory provisions. Because the rule was originally based on that of another agency (*i.e.*, HHS), there are some provisions that never were a close fit for the Department's programs. Moreover, the rule's organization and language do not meet the objectives of the Clinton Administration's current "Plain Language" policies. Under section 610 of the Regulatory Flexibility Act, agencies are directed to review existing rules from time to time with an eye to their effects on small businesses and other small entities.

For all these reasons, the Department decided to review Part 40. As a first step, we issued an advance notice of proposed rulemaking (ANPRM) on April 29, 1996 (61 FR 18713), asking for suggestions for change in the rule. We received 30 comments in response to this ANPRM. We then issued a notice of proposed rulemaking (NPRM) on December 9, 1999 (64 FR 69076). This NPRM proposed a comprehensive revision to Part 40. In response to the NPRM, we received letters from over 400 commenters, making around 4000 individual suggestions concerning the rule. We also held three public listening sessions, at which numerous interested parties commented further on the Department's proposals, and we held an internet forum. The final rule responds to all the comments and makes significant alterations to the existing rules governing the Department's drug and alcohol testing programs.

## Structure of the Rule

Perhaps the first thing readers will notice about this final rule is that we have thoroughly restructured Part 40, with subparts organized by subject matter area. Like the NPRM, and in contrast to the existing rule, the text is divided into many more sections, with fewer paragraphs each on average, to make it easier to find regulatory

provisions. The rule uses a question-answer format, with language specifically directing particular parties to take particular actions (e.g., "As an employer, you must * * *"). We have also tried to express the requirements of the rule in plain language. Commenters were very complimentary about the reorganization of the rule, generally praising it as much clearer and easier to follow than the existing rule. The Department received a plain language award, known as the "No Gobbledygook Award," from Vice President Gore's National Partnership for Reinventing Government in recognition of the improved clarity of the regulation. We have retained the NPRM's format and organization, which we believe will help drug and alcohol testing program participants understand and effectively carry out this rule.

What matters most in a rulemaking is not the number of letters favoring or opposing a particular proposal. Our central concern is with the substance of the comments. In discussing comments on this rule and our response to them, we will focus on the substance of positions that commenters expressed, and on why we did or did not make changes in response to various comments. In writing the preamble, we have avoided counting up the number of comments supporting a given position except in the most general way, believing that doing so would distract from the discussion of substantive issues.

## Effective Dates

The Department has decided to establish an August 1, 2001, effective date for the revised Part 40. We recognize that there is always some difficulty for everyone involved in the transition between an existing rule and a new rule. We hope that this delayed effective date will ease the transition. During the period between publication and August 1, program participants will have the opportunity to learn about new provisions before having to implement them. During this period, the Department expects to develop and issue guidance (*e.g.*, a revised medical review officer (MRO) manual) and make presentations at a significant number of conferences and training sessions. In addition, August 1 is the date on which use of the new Federal Drug Testing Custody and Control Form (CCF), to which the text of the revised Part 40 refers, becomes mandatory.

However, we believe it is important to begin implementing some new provisions sooner, since they enhance the fairness and integrity of the process. To do so, we must amend the *existing*

section (*e.g.*, the laboratory's data package), you must provide the requested information to the employer.

(d) As an employer or service agent, you must immediately notify the employee in writing of any information you release under this section.

### § 40.325 [Reserved]

### § 40.327 When must the MRO report medical information gathered in the verification process?

(a) As the MRO, you must, except as provided in paragraph (c) of this section, report drug test results and medical information you learned as part of the verification process to third parties without the employee's consent if you determine, in your reasonable medical judgment, that:

(1) The information is likely to result in the employee being determined to be medically unqualified under an applicable DOT agency regulation; or

(2) The information indicates that continued performance by the employee of his or her safety-sensitive function is likely to pose a significant safety risk.

(b) The third parties to whom you are authorized to provide information by this section include the employer, a physician or other health care provider responsible for determining the medical qualifications of the employee under an applicable DOT agency safety regulation, a SAP evaluating the employee as part of the return to duty process (see § 40.293(g)), a DOT agency, or the National Transportation Safety Board in the course of an accident investigation.

(c) If the law of a foreign country (*e.g.*, Canada) prohibits you from providing medical information to the employer, you may comply with that prohibition.

### § 40.329 What information must laboratories, MROs, and other service agents release to employees?

(a) As an MRO or service agent you must provide, within 10 business days of receiving a written request from an employee, copies of any records pertaining to the employee's use of alcohol and/or drugs, including records of the employee's DOT-mandated drug and/or alcohol tests. You may charge no more than the cost of preparation and reproduction for copies of these records.

(b) As a laboratory, you must provide, within 10 business days of receiving a written request from an employee, and made through the MRO, the records relating to the results of the employee's drug test (*i.e.*, laboratory report and data package). You may charge no more than the cost of preparation and reproduction for copies of these records.

(c) As a SAP, you must make available to an employee, on request, a copy of all SAP reports (see § 40.311).

### § 40.331 To what additional parties must employers and service agents release information?

As an employer or service agent you must release information under the following circumstances:

(a) If you receive a specific, written consent from an employee authorizing the release of information about that employee's drug or alcohol tests to an identified person, you must provide the information to the identified person. For example, as an employer, when you receive a written request from a former employee to provide information to a subsequent employer, you must do so. In providing the information, you must comply with the terms of the employee's consent.

(b) If you are an employer, you must, upon request of DOT agency representatives, provide the following:

(1) Access to your facilities used for this part and DOT agency drug and alcohol program functions.

(2) All written, printed, and computer-based drug and alcohol program records and reports (including copies of name-specific records or reports), files, materials, data, documents/documentation, agreements, contracts, policies, and statements that are required by this part and DOT agency regulations.

(c) If you are a service agent, you must, upon request of DOT agency representatives, provide the following:

(1) Access to your facilities used for this part and DOT agency drug and alcohol program functions.

(2) All written, printed, and computer-based drug and alcohol program records and reports (including copies of name-specific records or reports), files, materials, data, documents/documentation, agreements, contracts, policies, and statements that are required by this part and DOT agency regulations.

(d) If requested by the National Transportation Safety Board as part of an accident investigation, you must provide information concerning post-accident tests administered after the accident.

(e) If requested by a Federal, state or local safety agency with regulatory authority over you or the employee, you must provide drug and alcohol test records concerning the employee.

(f) Except as otherwise provided in this part, as a laboratory you must not release or provide a specimen or a part of a specimen to a requesting party, without first obtaining written consent

from ODAPC. If a party seeks a court order directing you to release a specimen or part of a specimen contrary to any provision of this part, you must take necessary legal steps to contest the issuance of the order (*e.g.*, seek to quash a subpoena, citing the requirements of § 40.13 ). This part does not require you to disobey a court order, however.

### § 40.333 What records must employers keep?

(a) As an employer, you must keep the following records for the following periods of time:

(1) You must keep the following records for five years:

(i) Records of employee alcohol test results indicating an alcohol concentration of 0.02 or greater;

(ii) Records of employee verified positive drug test results;

(iii) Documentation of refusals to take required alcohol and/or drug tests (including substituted or adulterated drug test results);

(iv) SAP reports; and

(v) All follow-up tests and schedules for follow-up tests.

(2) You must keep records for three years of information obtained from previous employers under § 40.25 concerning drug and alcohol test results of employees.

(3) You must keep records of the inspection, maintenance, and calibration of EBTs, for two years.

(4) You must keep records of negative and cancelled drug test results and alcohol test results with a concentration of less than 0.02 for one year.

(b) You do not have to keep records related to a program requirement that does not apply to you (*e.g.*, a maritime employer who does not have a DOT-mandated random alcohol testing program need not maintain random alcohol testing records).

(c) You must maintain the records in a location with controlled access.

(d) A service agent may maintain these records for you. However, you must ensure that you can produce these records at your principal place of business in the time required by the DOT agency. For example, as a motor carrier, when an FMCSA inspector requests your records, you must ensure that you can provide them within two working days.

### Subpart Q—Roles and Responsibilities of Service Agents

### § 40.341 Must service agents comply with DOT drug and alcohol testing requirements?

(a) As a service agent, the services you provide to transportation employers must meet the requirements of this part

issuance of the Director's decision or up to 90 days following its publication in the **Federal Register** or posting on the Department's web site, unless otherwise specified in the Director's PIE decision or the Director grants an extension as provided in paragraph (b) of this section.

*Example to Paragraph (f).* The Department issues a PIE concerning Service Agent N on September 1. All tests conducted using N's services before September 1, and through November 30, are valid for all purposes under DOT drug and alcohol testing regulations, assuming they meet all other regulatory requirements.

### §40.411   What is the role of the DOT Inspector General's office?

(a) Any person may bring concerns about waste, fraud, or abuse on the part of a service agent to the attention of the DOT Office of Inspector General.

(b) In appropriate cases, the Office of Inspector General may pursue criminal or civil remedies against a service agent.

(c) The Office of Inspector General may provide factual information to other DOT officials for use in a PIE proceeding.

### §40.413   How are notices sent to service agents?

(a) If you are a service agent, DOT sends notices to you, including correction notices, notices of proposed exclusion, decision notices, and other notices, in any of the ways mentioned in paragraph (b) or (c) of this section.

(b) DOT may send a notice to you, your identified counsel, your agent for service of process, or any of your partners, officers, directors, owners, or joint venturers to the last known street address, fax number, or e-mail address. DOT deems the notice to have been received by you if sent to any of these persons.

(c) DOT considers notices to be received by you—

(1) When delivered, if DOT mails the notice to the last known street address, or five days after we send it if the letter is undeliverable;

(2) When sent, if DOT sends the notice by fax or five days after we send it if the fax is undeliverable; or

(3) When delivered, if DOT sends the notice by e-mail or five days after DOT sends it if the e-mail is undeliverable.

2. Effective August 1, 2001, revise 49 CFR Part 40 to read as follows:

### PART 40—PROCEDURES FOR TRANSPORTATION WORKPLACE DRUG AND ALCOHOL TESTING PROGRAMS

**Subpart A—Administrative Provisions**
Sec.

40.1   Who does this regulation cover?
40.3   What do the terms used in this regulation mean?
40.5   Who issues authoritative interpretations of this regulation?
40.7   How can you get an exemption from a requirement in this regulation?

**Subpart B—Employer Responsibilities**

40.11   What are the general responsibilities of employers under this regulation?
40.13   How do DOT drug and alcohol tests relate to non-DOT tests?
40.15   May an employer use a service agent to meet DOT drug and alcohol testing requirements?
40.17   Is an employer responsible for obtaining information from its service agents?
40.19   [Reserved]
40.21   May an employer stand down an employee before the MRO has completed the verification process?
40.23   What actions do employers take after receiving verified test results?
40.25   Must an employer check on the drug and alcohol testing record of employees it is intending to use to perform safety-sensitive duties?
40.27   Where is other information on employer responsibilities found in this regulation?

**Subpart C—Urine Collection Personnel**

40.31   Who may collect urine specimens for DOT drug testing?
40.33   What training requirements must a collector meet?
40.35   What information about the DER must employers provide to collectors?
40.37   Where is other information on the role of collectors found in this regulation?

**Subpart D—Collection Sites, Forms, Equipment and Supplies Used in DOT Urine Collections**

40.41   Where does a urine collection for a DOT drug test take place?
40.43   What steps must operators of collection sites take to protect the security and integrity of urine collections?
40.45   What form is used to document a DOT urine collection?
40.47   May employers use the CCF for non-DOT collections or non-Federal forms for DOT collections?
40.49   What materials are used to collect urine specimens?
40.51   What materials are used to send urine specimens to the laboratory?

**Subpart E—Urine Specimen Collections**

40.61   What are the preliminary steps in the collection process?
40.63   What steps does the collector take in the collection process before the employee provides a urine specimen?
40.65   What does the collector check for when the employee presents a specimen?
40.67   When and how is a directly observed collection conducted?
40.69   How is a monitored collection conducted?
40.71   How does the collector prepare the specimens?

40.73   How is the collection process completed?

**Subpart F—Drug Testing Laboratories**

40.81   What laboratories may be used for DOT drug testing?
40.83   How do laboratories process incoming specimens?
40.85   What drugs do laboratories test for?
40.87   What are the cutoff concentrations for initial and confirmation tests?
40.89   What is validity testing, and are laboratories required to conduct it?
40.91   What validity tests must laboratories conduct on primary specimens?
40.93   What criteria do laboratories use to establish that a specimen is dilute or substituted?
40.95   What criteria do laboratories use to establish that a specimen is adulterated?
40.97   What do laboratories report and how do they report it?
40.99   How long does the laboratory retain specimens after testing?
40.101   What relationship may a laboratory have with an MRO?
40.103   What are the requirements for submitting blind specimens to a laboratory?
40.105   What happens if the laboratory reports a result different from that expected for a blind specimen?
40.107   Who may inspect laboratories?
40.109   What documentation must the laboratory keep, and for how long?
40.111   When and how must a laboratory disclose statistical summaries and other information it maintains?
40.113   Where is other information concerning laboratories found in this regulation?

**Subpart G—Medical Review Officers and the Verification Process**

40.121   Who is qualified to act as an MRO?
40.123   What are the MRO's responsibilities in the DOT drug testing program?
40.125   What relationship may an MRO have with a laboratory?
40.127   What are the MRO's functions in reviewing negative test results?
40.129   What are the MRO's functions in reviewing laboratory confirmed positive, adulterated, substituted, or invalid drug test results?
40.131   How does the MRO or DER notify an employee of the verification process after a confirmed positive, adulterated, substituted, or invalid test result?
40.133   Under what circumstances may the MRO verify a test as positive, or as a refusal to test because of adulteration or substitution, without interviewing the employee?
40.135   What does the MRO tell the employee at the beginning of the verification interview?
40.137   On what basis does the MRO verify test results involving marijuana, cocaine, amphetamines, or PCP?
40.139   On what basis does the MRO verify test results involving opiates?
40.141   How does the MRO obtain information for the verification decision?
40.143   [Reserved]

adulterated tests and other refusals to test. We have done so.

Another commenter raised the issue of a different kind of legal proceeding. The commenter asked whether otherwise confidential information could be released in a personal injury lawsuit where the employee's conduct was an issue (*e.g.*, a truck or bus driver involved in a collision). We believe that, if a court orders the production of such information because it is relevant in such a proceeding, it is reasonable for the employer to provide it without getting the employee's consent. In this situation, the requirements of justice in the litigation outweigh the employee's privacy interest. We have added a paragraph to this effect. We also added a paragraph telling a service agent who is holding this information to provide it to the employer when the employer requests it for use in a legal proceeding covered by this section.

*Section 40.327   When Must the MRO Report Medical Information Gathered in the Verification Process?*

This section provides that, under certain circumstances, MROs must provide certain otherwise confidential information to employers and certain other parties. The purpose of providing this information is to enhance safety. Commenters had a variety of concerns about this section. One comment suggested that the medical information be provided in writing in all cases. We think that a prudent MRO may choose to do so, but we do not believe that a regulatory requirement is needed.

Some commenters objected to the paragraph that allows MROs to consult with the employee's own physician to see if alternate medication might be available that would be less likely to adversely affect safety, saying that MROs should stay out of what looks like a doctor-patient relationship with employees. A few commenters supported this proposal. Under the proposal, the MRO would take this step only with the employee's consent, and for the purpose of helping the employee find medication that would be compatible with safe job performance. From both the point of view of employee interests and safety, we believe that this proposal is sound, and we have retained it.

One commenter said that Canadian law would preclude a doctor from releasing this information to an employer. We have added a provision saying that if the law of a foreign country, such as Canada, prohibits MROs from providing medical information to the employer, the MROs may comply with that prohibition.

Another commenter pointed out that not only physicians, but also other medical professionals, may make determinations about whether an employee meets physical qualification standards. We have adopted the commenter's suggestion that the MRO can release information to the "health care provider" involved in this activity. Consistent with the SAP provisions of the rule, we have included SAPs who are evaluating employees as part of the return-to-duty process as a party to whom the MRO can provide information under this section.

Finally, as some commenters requested, we have made it mandatory for MROs to release information under this section if the information is likely to result in the employee being medically unqualified for performance of safety-sensitive duties under a DOT regulation or if the information indicates that continued performance by the employee of his or her safety-sensitive function is likely to pose a significant safety risk. In this case, the Department believes that the safety interest served by the information release outweighs the confidentiality interest of the employee.

We point out that the medical information described in this section cannot be transmitted to employers or other parties using a C/TPA or other service agent as an intermediary. MROs must transmit this information directly to the employer.

*Section 40.329   What Information Must Laboratories and Other Service Agents Release to Employees?*

Proposed § 40.329, concerning release of information by MROs to third-party employers, has been deleted, for the reasons given in the "Principal Policy Issues" section of the preamble. This section is based on proposed § 40.331 of the NPRM.

One commenter requested that the Department require that laboratories provide all records requested by an employee, as well as a laboratory person to testify in a legal proceeding who has firsthand knowledge of the laboratory, its records, and operating procedures. This commenter also requested that the rule require the laboratory to make records available within 10 days, rather than waiting for payment from the employee. This section does require that laboratories and other service agents provide a "data package" (sometimes referred to as a "litigation package") upon the employee's request. We do require that they provide it within 10 business days. The rule also limits the charge the service agent can make for the cost of copying and preparation. We

believe these provisions adequately protect employee interests. We do not believe it is necessary, as another commenter suggested, to list the contents of a litigation package, which is quite standard and well understood among laboratories.

We have not adopted the suggestion that laboratories be required to produce witnesses for appearances at legal proceedings. Such an open-ended requirement would impose, in our view, unnecessary costs and burdens on laboratories and other service agents. There are adequate means (*e.g.*, documentary evidence) through which employees can raise issues about the testing process.

The NPRM proposed that laboratories provide to employees, on written request, information relating to the results of relevant HHS certification reviews. One comment supported this proposal, which is consistent with long-standing DOT interpretation of the existing Part 40, while another commenter proposed that the laboratory's obligation be limited to the latest HHS **Federal Register** notice listing the laboratory as certified. Based on conversations with HHS staff, we have decided to delete this provision. HHS staff believe that providing this information would unnecessarily intrude on the HHS-laboratory relationship and could result in the introduction of misleading information about the laboratory certification process in legal proceedings involving drug test results.

*Section 40.331   To What Additional Parties Must Employers and Service Agents Release Information?*

This section is based on § 40.333 of the NPRM. Some commenters objected to being required to permit DOT representatives to see a broad array of drug and alcohol testing information. DOT has significant safety responsibilities for transportation industries, of which our drug and alcohol testing rules are an important part. As part of its safety mandate, DOT must be able to inspect regulated employers and those who carry out their drug and alcohol testing program responsibilities. DOT cannot do this job unless we have access to all relevant information. We believe it is vital to maintain this provision in the final rule. We would point out, particularly in response to a comment that Canadian MROs could not legally release certain information, that this paragraph focuses on the inspection and review of documents as part of the DOT oversight process, not on release of information to third parties.

Commenters pointed out that, in some jurisdictions, state laws or rules require employers or service agents to provide drug test result information to state law enforcement or safety agencies. To ensure that there is no conflict between Part 40 and these state laws or rules, we have added language (already found in some DOT agency rules) to this section. It says that if requested by a state or local safety agency with regulatory authority over the employer or employee, employers and service agents must provide drug and alcohol test records concerning the employee to the agency. This paragraph also covers Federal agency requests (including requests by DOT, HHS, and the National Transportation Safety Board) for drug and alcohol test records. It should be noted that this paragraph applies only to testing records. It does not authorize provision of specimens.

We have also added a paragraph stating in rule text the advice we have frequently given to employers and service agents faced with subpoenas or other orders directing them, contrary to Part 40 requirements, to produce specimens where Part 40 does not permit. What is a laboratory or other party to do if it gets a request to produce a urine specimen or aliquot for an unauthorized test? The first thing the laboratory should do is to "just say no," giving this DOT regulatory mandate as the reason. If someone seeks a subpoena or other court order directing the production of the specimen, the laboratory's attorneys should seek to quash or resist the action, asserting on the basis of this section that such an order is contrary to Federal law and subject to Federal pre-emption (under the existing pre-emption provisions of DOT agency drug and alcohol regulations). In such cases, we suggest that laboratories call the Department to consult about the matter. If a court ultimately issues a binding order requiring the production of the specimen, the laboratory may comply (we do not seek to make laboratories subject to contempt citations). However, as noted above, employers must continue to implement all consequences of a verified positive test required by DOT rules, regardless of the outcome of the unauthorized test or any personnel process decisions flowing from it.

### Section 40.333   What Records Must Employers Keep?

This section is based on § 40.335 of the NPRM. In response to a number of comments and consistent with decisions reflected elsewhere in this document, proposed requirements for the retention of records concerning training of service

agents and signed agreements with service agents have been deleted. Under the final rule, collectors, BATs, MROs etc. will maintain their own training records, and employers will not have this responsibility. The requirement to have signed agreements among employers and all service agents has been deleted.

In response to a comment, we have deleted the word "secure" from paragraph (c), since we agree that control of access is the key point. One comment suggested that service agents should have up to five business days to get information to employers who are being audited. In our view, each DOT agency's rules and inspection practices should determine how quickly an employer must produce records. The service agent is responsible for meeting the employer's need to comply with DOT agency requirements.

### Subpart Q—Roles and Responsibilities of Service Agents

### Section 40.341   Must Service Agents Comply With DOT Drug and Alcohol Testing Requirements?

There was only one comment on the proposed § 40.341. AC/TPA wanted C/TPAs to be authorized to act as a DER and to be required to have a certified MRO or administrator in charge. For reasons we have discussed elsewhere, we are not permitting C/TPAs to act as DERs. While we think that training and certification programs for program administrators are a good idea, we do not believe that it is necessary to make them mandatory at this point.

### Section 40.343   What Tasks May a Service Agent Perform for An Employer?

This is a new section that makes the basic point that service agents can perform for employers those functions authorized by DOT rules. Proposed § 40.343 dealt with a different issue. DOT has become aware of reports that, particularly in some industries, service agents have imposed requirements on covered entities that exceed the requirements of DOT rules. Some service agents have made compliance with these extra requirements a condition of approval of an employer's DOT drug and alcohol testing program. The proposed section was intended specifically to prevent excesses of this kind.

There were few comments on the proposed section. One said that service agents work for employers in capacities other than compliance with DOT rules. This is doubtless true, but is an issue outside the scope of this rulemaking. One commenter suggested that there

was a reverse problem, in that sometimes employers asked service agents (e.g., SAPs) to perform tasks beyond what DOT rules require (e.g., make fitness for duty decisions). We have strengthened language elsewhere in Part 40 to emphasize that it is inappropriate to call on SAPs to make these decisions for employers. A third commenter was concerned that the section might inhibit the ability of service agents to advise employers to recommend provisions not covered by DOT rules. Service agents can recommend provisions not covered by DOT rules, but they cannot make adoption of these recommendations a condition of approving employers' plans for DOT compliance purposes.

The Department has relocated this provision to § 40.355(l).

### Section 40.345   In What Circumstances May a C/TPA Act as an Intermediary in the Transmission of Drug and Alcohol Testing Information to Employers?

The proposed § 40.345 made the point that a service agent that did not comply with DOT regulations was subject to PIE proceedings. Comments to this proposal were along the lines of comments on the PIE proceeding itself, to which we responded in the "Principal Policy Issues" section of the preamble. The substance of this proposed section has been incorporated in § 40.341 of the final rule.

The new § 40.345 incorporates the Department's decision, discussed at length under "Principal Policy Issues," to permit employers to use C/TPAs for a variety of information transmission functions, such as passing drug and alcohol test results from MROs or BATs to employers. We emphasize four points. First, with respect to any and all of the functions that C/TPAs may perform, the employer has the choice of using a C/TPA as an intermediary or getting the information directly from the party (e.g., the MRO) who generates the information. Second, we direct readers' attention to Appendix F. C/TPAs may act as intermediaries *only* with respect to the functions listed in Appendix F.

Third, when C/TPAs act as an intermediary, they must meet all requirements (e.g., concerning confidentiality and timing) that would apply if the party generating the information (e.g., an MRO or collector) sent the information directly to the employer. For example, if a C/TPA transmits the MRO's drug testing results to DERs, it must transmit each drug test result to the DER in compliance with the requirements for MROs set forth in § 40.167. Fourth, as noted in connection with § 40.15, employers remain fully

The NPRM mentioned transmitting negative results within 72 hours. Some commenters thought this period should be shortened to 24 or 48 hours, while one laboratory thought it would be too burdensome to use couriers on weekends to meet this goal. The final rule says that results should be transmitted to the MRO on the same day or business day after review by the certifying scientist is complete. Besides taking care of any weekend worries, this provision, in tandem with the use of electronic methods permitted under the rule, should result in expeditious transmission of results.

*Section 40.99   How Long Does the Laboratory Retain Specimens After Testing?*

We have simplified this section. Specimens which were positive, adulterated, substituted, or invalid must be kept for one year. In response to requests from commenters, we have provided that the laboratory must keep the specimens longer only if they receive a request from an employer, employee, MRO, C/TPA, or DOT agency representative. Absent such a request, the laboratory may discard the specimen. This rule applies to primary and split specimens alike. With respect to negative tests and specimens rejected for testing (*e.g.,* because of a fatal or uncorrected flaw), the laboratory should follow HHS guidance. We do not believe it is necessary to restate the guidance here.

*Section 40.101   What Relationship May a Laboratory Have With an MRO?*

This section focuses on potential conflicts of interest between MROs and laboratories. We discussed comments on this issue and the Department's responses in the "Principal Policy Issues" portion of the preamble.

*Section 40.103   What Are the Requirements for Submitting Blind Specimens to a Laboratory?*

The NPRM proposed to reduce the number of blind specimens employers and other program participants were required to send to laboratories. We made this proposal because it would reduce costs and burdens and because the laboratory testing program appears to be running very smoothly. Comments were divided on this issue. A majority of commenters, especially from employers and their groups, supported the proposal. Some said they had never heard of a laboratory error. Others said that blind specimen testing had outlived its usefulness and should be eliminated. On the other hand, a number of commenters said that to reduce the

number of blind specimens would endanger the accuracy and integrity of the laboratory testing program.

We also received a number of comments saying that if we make validity testing mandatory, adulterated and substituted samples should also be included in the blind testing program. Some commenters expressed concern about being able to find adulterated blind specimens. A few comments from TPAs suggested that they should not have to send in blind specimens, even when they submitted more than 2000 specimens in the aggregate, because doing so should remain the individual employer's responsibility.

The Department believes the NPRM proposed a good balance between considerations of reducing burdens and maintaining an effective check on laboratory performance. We have had few if any laboratory accuracy problems over the history of the program, and we believe that we can continue to ensure that this pattern continues while reducing burdens and costs on participants. We agree that adulterated and substituted specimens should be made part of the blind specimen testing program, and we have consequently changed the proportions of specimens in the program to be 75 percent negative, 15 percent positive, and 10 percent adulterated or substituted. This is particularly important given the recent problems at some laboratories concerning validity testing. Given that this provision will not take effect until next August, we think that producers will have time to market adulterated and substituted blind specimens.

We believe that any organization that transmits to laboratories the requisite number of specimens in the aggregate should be responsible for participating in the blind testing program. This is true no matter whether the organization is an employer, a C/TPA, or some other service agent. The structure of the organization is irrelevant for this purpose. To decide otherwise would permit large gaps in the blind testing program. If 100 employers with 20 employees each are served by a C/TPA, and the C/TPA does not submit blind specimens, then no one will submit such specimens with respect to these employees, since each of the employers is too small on its own to be required to participate. Permitting this gap to exist would be disadvantageous from the program integrity standpoint.

We would also point out that C/TPAs, in virtually every other area of program administration, assert that they can perform a multitude of functions for everyone involved in the program. We do not see any compelling reason for

looking differently at their involvement in blind specimen testing.

*Section 40.105   What Happens if the Laboratory Reports a Result Different From That Expected for a Blind Specimen?*

Some commenters objected to the proposed requirement for notification of DOT in the event of a laboratory error, or to the idea that ODAPC could direct laboratories to take corrective action. The main argument of these comments was that HHS had what they viewed as exclusive jurisdiction over testing matters, on which DOT should not infringe. We have refocused the section on unexpected blind specimen results.

The Department would always coordinate closely with HHS on matters affecting laboratories, as indeed we have done in drafting this provision. The fact remains that many MROs and other participants in the DOT program have their primary Federal agency relationship with DOT agencies, and it makes sense to have them report problems to DOT. It is also important to realize that testing laboratories, while certified by HHS, receive significantly more specimens as a result of the DOT program than as a result of the Federal employee testing program. Under these circumstances, a DOT role in noting and helping to correct any laboratory-related problems affecting the DOT program seems most appropriate.

Because we are requiring blind specimens in connection with validity testing, this section necessarily covers errors in validity testing.

*Section 40.107   Who May Inspect Laboratories?*

In response to comments, we are clarifying that the employers who may inspect laboratories are those who use or are negotiating to use its services for DOT-regulated testing.

*Section 40.109   What Documentation Must the Laboratory Keep, and for How Long?*

The Department has simplified this section and acted to reduce paperwork burdens, as a number of commenters recommended. All records supporting test results and those cited in § 40.111 must be kept for two years, unless an MRO, employer, employee, or DOT agency representatives requests an extension within the two-year period (*e.g.,* for litigation purposes). If no such request is received, the laboratory may discard the records.

*Proposed § 40.13 Nuclear Regulatory Commission (NRC) Program*

The NPRM proposed that there be reciprocity between the DOT and NRC drug and alcohol testing programs. A number of commenters favored this approach in principle, some asking that the notion of reciprocity be extended to other Federal testing programs. A few commenters opposed the proposal, saying that NRC rules did not measure up to DOT rules. Other commenters pointed to numerous differences between the two regulatory programs, with respect to program concepts, specific requirements, forms, and administration. Some suggested that a reciprocity agreement be created between the two agencies detailing how these differences would be handled. Others said that the more stringent of the two rules on each particular point should govern.

The Department has concluded that the wide variety of program differences between the DOT and NRC regulations make it impractical to establish reciprocity between the two systems. These differences involve such matters as testing methods, consequences of some alcohol test results, alcohol testing forms, reporting and recordkeeping, inspection and enforcement procedures and responsibilities, and return-to-work procedures. We believe it would be very difficult to craft a provision that did justice to both programs and decreased, rather than increased, confusion among employers and employees. While we believe reciprocity and ''one-stop shopping'' are worthwhile objectives, we do not believe they are practically achievable in this case. In addition, the numbers of double-covered employees and employers (either with NRC or other Federal agencies) are quite small in comparison to the total number of parties covered by the DOT program. For these reasons, we are not making this proposed section part of the final rule.

*Section 40.13 How Do DOT Drug and Alcohol Tests Relate to Non-DOT Tests?*

This section is based on proposed § 40.15 of the NPRM. It continues to require that DOT and non-DOT tests be kept strictly separate. Comments were generally supportive of this concept, but some asked for clarification. Paragraph (b), for example, clearly concerns collections rather than other parts of the testing process, and the text has been changed to make this explicit. This provision does not, as one commenter wondered, mean that laboratories must process DOT and non-DOT specimens in separate batches. Another commenter

suggested that the ''firewall'' between DOT and non-DOT tests would be stronger if we required that an employer use separate laboratories for the two types of tests. We have not become aware of any problems that use of the same laboratory has created, and we think that this idea would increase costs and administrative complexity for employers.

A few commenters mentioned a desire to permit tests for other drugs, beyond the ''HHS five.'' This is a long-standing issue in the program, and DOT continues to take the position that we ought not go beyond the testing that HHS has authorized and for which HHS has certified laboratories. We agree with comments that inadvertent use of non-Federal forms should be a correctable flaw and that employers may appropriately use the CCF for Federally-regulated tests (*i.e.,* under the HHS program for Federal agencies). The final text makes changes to these effects. The Department does not object to laboratories creating a standard form for non-DOT tests.

One of the most important provisions of this section prohibits the use of DOT specimens for tests other than the ones explicitly authorized by this part. For example, the rule forbids laboratories and other parties from making a DOT specimen available for DNA testing. This incorporates in the rule text a long-standing DOT interpretation of Part 40. We say this for two main reasons. First, under these regulations, a properly completed chain of custody conclusively establishes the identity of a specimen. No additional tests are required for this purpose.

Second, the only thing a DNA test can do is to determine, to a high level of probability, whether a specimen and a reference specimen were produced by the same individual. If the DNA test establishes a high probability that the original specimen tested for drugs and a reference specimen came from different individuals, this may mean one of four things. It could mean that there was an error in the collection, transmission, or handling of the specimen. It could mean that the employee provided a substituted specimen (*e.g.,* someone else's urine) at the original collection and provided his or her own urine for the reference specimen. It could mean that the employee provided his or her own urine at the original collection and substituted someone else's urine for the reference specimen. It could mean that the individual provided substituted specimens from two different sources at the original collection and for the reference specimen. A DNA test cannot

distinguish among these possibilities. Given a proper chain of custody, the last three possibilities are significantly more probable in practice than the first. A DNA finding of difference between the two specimens is not, then, a valid basis for canceling a test.

Even if a DNA test is performed, contrary to these rules, this section prohibits employers from changing or disregarding a verified positive test. In such a case, regardless of the result of the unauthorized test, the employer cannot return the employee to the performance of safety-sensitive functions until and unless the employee successfully completes the return-to-duty process. The same point applies to other unauthorized tests (*e.g.,* if the employee goes to his or her own doctor and gets a second urine test or a blood test).

*Section 40.15 May an Employer Use a Service Agent to Meet DOT Drug and Alcohol Testing Requirements?*

This provision is based on § 40.17 of the NPRM. It provides that an employer may use a service agent to carry out drug and alcohol testing program tasks. There were not many comments on this section, and they generally supported the provision. Some commenters sought to limit the responsibility of employers, saying they should not be accountable if they failed to comply with the rules because a service agent erred. As noted above, we disagree: employers always remain accountable for noncompliance, whether they run their own programs or outsource them. Another comment suggested laboratories should not be subject to DOT regulations, since they are regulated by HHS. It is certainly true that DOT relies on HHS for laboratory certification matters. However, laboratories have responsibilities under Part 40 independent of their HHS responsibilities (*e.g.,* with respect to relationships with MROs, release of information, and validity testing), and laboratories must be accountable to DOT in those matters.

We agree, however, that we should not require employers to have active monitoring responsibilities with respect to service agents, though employers may choose to monitor their service agents' performance. Therefore, we have altered paragraph (b) to require employers simply to make sure that service agents meet regulatory qualifications. To this end, employers may ask to see documentation from service agents, who are obligated to provide it.

counterproductive overlap in roles between the two types of organizations, and we are retaining the NPRM's statement that C/TPAs are not employers. Any statements to the contrary in DOT agency rules would be changed in the agencies' proposed conforming amendments to this rule.

One commenter expressed concern that it was troublesome to have service agents contact a DER when there was another company representative on the scene of a testing event. This comment appeared to assume that an employer can have only one DER. This is not the case. An employer can designate as many DERs as it needs to carry out its program effectively.

Several comments on the definitions of "medical review officer" (MRO) and "substance abuse professional" (SAP) asked that other professions or members of professional groups be included within the definitions. We will discuss these issues in connection with the MRO and SAP provisions of the rule. Training and qualification matters are found in substantive sections of the rule (e.g., § 40.121 for MROs), and it is not necessary to duplicate them here. However, we have added to this section definitions of terms that are used to label different types of training for MROs, SAPs, collectors, and BATs/ STTs (e.g., qualification training, refresher training).

With respect to the term "chain of custody," we note that the definition of this term is not intended to suggest that the MRO is responsible, as part of his or her chain of custody review, to examine the internal laboratory chain of custody. The MRO need only review the CCF itself.

Commenters questioned the definitions of "dilute" and "substituted" specimens. One commenter noted that it was unnecessary to suggest that a "dilute" specimen had been watered down by the improper action of an employee. We agree, and have expressed the definition, like that of "substitution," in neutral, descriptive terms. These definitions are augmented later in the rule by quantitative criteria for dilute and substituted specimens.

One commenter suggested slightly rewording several definitions of terms for the alcohol testing part of the program. These suggestions generally did not result in any significant substantive changes in these definitions, and we have left the definitions as they were in the NPRM. A few commenters asked for a different term in place of "service agent," one suggesting "substance abuse service professional (SASP)." The Department believes the

"service agent" term is short, easily understood, and inclusive, so we are retaining it. Finally, for greater clarity, we have added definitions of the "Office of Drug and Alcohol Policy and Compliance (ODAPC)" and "validity testing" to this section.

*Section 40.5   Who Issues Authoritative Interpretations of This Regulation?*

*Section 40.7   How Can You Get an Exemption From a Requirement in This Regulation?*

There were few comments about these administrative provisions. One commenter asked how to obtain answers to interpretation questions, and another asked how one might object to interpretations of Part 40. We recommend calling or writing ODAPC. A commenter suggested publishing all interpretations in the **Federal Register** periodically. We believe that it is useful to make all interpretations widely available, and we will post them on the ODAPC web site (www.dot.gov/ost/ dapc). We will also consider whether publication in the **Federal Register** would be a useful additional step.

This interpretation authority applies to the application factual situations of the provisions of this rule. The Department is often asked whether, for example, the rule requires the cancellation of a test in a particular circumstance. The answer to this question is, in effect, an interpretation of the text of the rule as applied to the facts of the situation. ODAPC and the General Counsel's office work closely with the operating administrations to ensure consistency of all such interpretations with both Part 40 and the other DOT agency rules.

We will retain the provision that makes only new guidance, issued after publication of this rule, valid. We have substantially rewritten Part 40. Much of the substance of interpretations of the former version of Part 40 is found in the text of the new rule. Other guidance pertains to a version of the rule that will no longer exist. We anticipate publishing additional guidance pertaining to the new Part 40 (e.g., an MRO manual) before the effective date of the new rule.

We want to emphasize that an exemption is not the same thing as a waiver. An exemption is, in effect, a rulemaking of particular applicability that responds to an unusual situation, not contemplated in the rulemaking and not having general application to a wide variety of situations. An agency cannot properly make *de facto* applicable amendments to a rule through exemptions, because this would

circumvent the rulemaking process requirements of the Administrative Procedure Act. A waiver, on the other hand, is a generally applicable provision in a rule that permits regulated parties to comply through an alternative means, if certain conditions are met (e.g., § 40.21).

Part 40 is an Office of the Secretary (OST) rule. Consequently it is OST, and only OST, that has the authority to grant exemptions from it. Since Part 40 is applied to regulated employers through the other DOT agency drug and alcohol testing regulations, exemptions to Part 40 are implemented via the other DOT agency regulations. There may be situations in which DOT agency regulations impose requirements that go beyond those of Part 40. In such a case, a regulated party might need to obtain an exemption from the additional DOT agency provision as well as from a Part 40 provision.

**Subpart B—Employer Responsibilities**

*Section 40.11   What Are the General Responsibilities of Employers Under This Regulation?*

Most of the comments about this section concerned proposed paragraphs (d)–(f), which would have required contracts or written agreements between service agents and employers to include a clause making compliance with Part 40 a material term of the contract. These comments and the Department's response are discussed in the "Principal Policy Issues" portion of the preamble.

A few commenters also objected to language in the proposed paragraph (b) saying that employers must ensure that service agents comply with their regulatory responsibilities. The thrust of these comments was that employers do not have the resources or expertise to monitor the compliance of their sometimes far-flung service agents. In response, we have merged language of paragraph (b) with § 40.15(c). It no longer places an active compliance monitoring responsibility on employers, but simply says that the employer's good faith use of a service agent is not a defense to a DOT enforcement action. For example, if an employer's MRO fails to conduct verification interviews, the employer could be subject to civil penalties from a DOT agency (the MRO could independently be subject to a PIE proceeding). As an employer, you can contract out your drug and alcohol testing program functions, but you cannot contract away your compliance responsibilities.

of being notified by the MRO that his or her test has been verified adulterated or substituted, the employee may request a test of the split specimen. A second laboratory will test the split specimen.

Laboratories will use the testing criteria set forth in HHS rules or guidance. Under current HHS criteria for adulterants, the test of the split specimen is for the presence of an adulterant, or, in the case of an adulteration finding based on pH, to ensure that the pH of the specimen meets the same regulatory criteria as for the primary specimen. In the case of substitution, the split specimen must meet the same regulatory criteria as for the primary specimen in order to be reconfirmed. As with drug positives, the consequence of a failure to reconfirm is a cancelled test.

With respect to MRO review, the Department's process will also parallel the existing procedure for drug positives. The employee will have the opportunity to present a legitimate medical explanation. The employee, as is the case for all drugs except opiates, has the burden of proof to demonstrate to the MRO that a legitimate medical explanation exists. To meet this burden in the case of an adulterated specimen, the employee will have to demonstrate that the adulterant entered his or her specimen through physiological means. This will not be easy to do. Most adulterants are substances that do not naturally occur in urine. There is no way one can physiologically produce urine that includes such substances as bleach, glutaraldehyde, or soap, for example. There cannot be a legitimate medical explanation for the presence of these substances in urine, any more than there can be a legitimate medical explanation for the presence of PCP in a specimen.

In cases where there is no reasonable apparent legitimate medical explanation, the MRO would verify the adulterated result. However, if an employee presents what the MRO believes could be a legitimate medical explanation, the MRO will tell the employee he or she may obtain additional evaluation from another physician, acceptable to the MRO, who has expertise relevant to the explanation. This would ensure that the MRO, standing alone, would not be called on to make a decision for which he or she lacked the needed expertise. The referral physician would make a recommendation about whether there was a legitimate medical explanation. The referral physician would evaluate any information presented by the employee in making his or her determination. If the referral physician

found that there was a legitimate medical explanation, the MRO would review the referral physician's recommendation and, if appropriate in the MRO's judgment, cancel the test.

MROs would follow the same process in the case of a substitution result. The MRO review provision for substitution emphasizes that it is not enough for the employee to show that he or she has a medical condition or has certain personal characteristics. The employee must establish the link between these facts and the ability to physiologically produce urine meeting the substitution criteria. For example, a replication of the employee's original test result, under carefully controlled conditions (including direct observation) could establish such a link.

To meet our fairness objectives, we believe it is necessary to provide MRO review that can result in the cancellation of a test if the employee provides a legitimate medical explanation. Nevertheless, the Department emphasizes that it is the employee's burden to prove that such an explanation exists. The MRO is not responsible for disproving an employee's assertions.

The Department will retain the word "substitution," rather than changing to a term like "hyper-dilute." Given the structure of the final rule, it seems clear that a laboratory "substituted" result is simply a confirmed result that must be verified by an MRO before becoming final, just like a confirmed drug positive. HHS uses this term in the Federal employee program, and it is useful to keep terms as consistent as possible between the two related programs.

The Department works closely with HHS on validity testing issues, and the Department will use validity testing criteria set forth in HHS requirements and guidance. Validity testing is a subject that HHS, like DOT, takes very seriously, and HHS will issue additional guidance, as needed, to support the DOT validity testing program. We will work with HHS to ensure that validity testing remains as technically sound as the rest of the DOT program. The updated and clarified collection procedures in this final rule will help insure the integrity of the urine specimen. In addition, each laboratory will conduct validity testing under specific HHS guidance and quality control review, and the blind specimen quality control program will include adulterated and substituted specimens. Validity testing has now become a factor in the HHS evaluation of laboratories for certification and recertification. In addition, the application of split

specimen testing and MRO review to validity tests will provide further safeguards for employees, parallel to the existing drug testing program.

*Laboratory Problems*

In September 2000, the Department learned of a significant series of errors by one laboratory involved in validity testing. The first error that came to our attention involved apparent misconduct by laboratory personnel. Following a test result that met HHS substitution criteria, laboratory personnel apparently backdated documents explaining a minor irregularity in laboratory controls used to check the accuracy of testing machinery. These documents were then placed in the "litigation package" intended for use in an FAA certification proceeding involving the employee. To make matters worse, someone allegedly tore up a purported photocopy of the original of the backdated documents, and the laboratory official who signed the litigation package (no longer employed by the laboratory) allegedly had claimed credentials he did not have. These events undermined the credibility of the laboratory in this case so much that FAA enforcement attorneys felt compelled to settle the certification action.

Second, the laboratory made significant errors in reading test results. One error was the practice of "truncating" creatinine measurements (*i.e.*, expressing results only in whole numbers). This practice, which was not specifically mentioned in HHS Program Document 35 but was specifically contrary to Program Document 37, causes any result in the 5 to 5.9 range to be reported as a 5. Since a result of 5 or less is one of the criteria for substitution, this practice could have the effect of causing a specimen that was outside the creatinine criterion for substitution to be interpreted as meeting this criterion. This throws into question substitution results where the creatinine measurement was a 5. (It does not affect results where the creatinine result was below 5.) In addition, laboratory personnel apparently interpreted an error message ("LLL") from a machine used to measure specific gravity as a measurement of 1.000. There is not a sound basis for making this interpretation.

When we learned of these problems, we immediately involved HHS. The DOT and HHS Inspector Generals reviewed the apparent evidence-tampering. In addition, this situation led us to add tampering with documentation by a laboratory as a type of noncompliance that can be subject to a PIE proceeding (see § 40.365). The

the performance of safety-sensitive functions until the employee has successfully completed the return-to-duty process. Nor can an arbitrator or an employer change the laboratory's findings about a specimen or an MRO's decision about whether there is a legitimate medical explanation for a test result.

**Collector Training**

Competent performance of drug and alcohol testing functions by collectors, BATs and STTs, MROs, SAPs and others involved in the testing process is obviously very important to the integrity and fairness of the Department's program. The Department's NPRM asked questions and offered proposals for the training and qualifications of these personnel. This discussion focuses on collector training, which was the subject of more comment than training for other personnel. Training and qualifications for other personnel are discussed in the section-by-section portion of the preamble.

*Comments*

Training for collectors in the drug testing program was the subject of comment from a wide variety of parties, including service agents, employers, and unions. Commenters differed on most of the subjects under discussion, including the basic point of the extent of current problems in the collection area. Most commenters on the subject believed that collections were the weakest point of the testing process, though some argued that there was a low rate of collection errors in their experience. Some commenters said that it would reduce collection errors if the Federal Custody and Control Form (CCF) were simplified.

Some commenters favored a formal instruction course for collectors, like the Department's BAT course. Most of these and some other commenters opposed the notions of self-instruction and self-certification for collectors, saying that they were meaningless. They believed that there should be some sort of formal training, with an examination or other means of ensuring that a collector deserved to be certified. Some commenters also supported a "train-the-trainer" course requirement to certify trainers.

Other commenters, however, opposed any formal training requirements for collectors, saying it was expensive, burdensome, and might make it harder to find collectors, especially in less densely populated areas. A maritime employer group asked for some exceptions to training requirements for people who were not regularly

collectors but might occasionally have to conduct a collection, as in a post-accident situation.

Commenters who thought the NPRM's training proposals were too extensive often objected to requirements for classroom training or other training modes involving a live instructor or monitor. They said the requirements should be more flexible, and provide for training through such approaches as videos, internet-based courses, or instruction and monitoring through telephone or interactive computer methods.

A number of commenters objected to the term "sufficiently knowledgeable," which the NPRM used to describe the personnel who trained collectors. The commenters said the term was too vague. Some of these commenters asked that the rule include more specific qualifications for trainers. Some commenters also objected to the proposal that trainees be required to complete five error-free mock collections, saying that the requirement was either too burdensome (some suggested the number of mock collections be reduced) or insufficient. Some commenters also took issue with the requirement that a collector who made a "fatal flaw" mistake should have to be retrained, particularly since they felt it might threaten the validity of subsequent collections the collector conducted prior to the retraining. Others thought it would be better to have a slower trigger for the retraining requirement (*e.g.,* two fatal flaws in two years).

*DOT Response*

The Department believes that making collector training more effective will be an important step in reducing errors in the drug testing process. The collection of urine specimens is the step in the process with the greatest potential for administrative error, and our own experience confirms the comments of persons who said that collections are a fertile source of mistakes. When our inspectors and program personnel visit collection sites in the field, they commonly find a wide variety of mistakes and misunderstandings in the collection process. We also agree that self-certification is inadequate. For these reasons, we will require additional training of collectors, compared to the present rule. We believe that this training should be provided in as flexible a manner as possible. Section 40.33 contains the Department's resolution of collector training issues. Part 40 contains much information about how collections must be conducted. It is essential that collectors

become knowledgeable about the relevant portions of the new Part 40, DOT collections guidance and relevant DOT agency rule provisions, and we will require them to do so. We also believe that more formal training is needed to ensure that collectors understand and can carry out the requirements of this part. We believe that, as commenters noted, the training can be provided in a number of ways (*e.g.,* classroom sessions, videos, internet courses). We are not prescribing a particular curriculum as we have for alcohol testing personnel, and we will not require that collectors be "certified." By taking this approach, we achieve the objective of additional training while allowing flexibility and minimizing costs. In-person involvement of a trainer is not required for this part of the training process.

To demonstrate that they can practically apply what they have learned, collectors must conduct five consecutive error-free mock collections. We believe this is an extremely important requirement, because collectors must deal with real people and real specimens in their job, not just regulatory text or computer simulations. By mock collections, we mean collections that are not real collections of employees subject to testing under DOT regulations. The five collections must include both uneventful and "problem" testing scenarios. Another person must monitor and evaluate the mock collections to ensure that they are error-free. This part of the process does involve the in-person participation of someone to monitor and evaluate the trainee's performance (unless some technology is used that permits the real-time, step-by-step observation and evaluation of the trainee's performance without a person in the same room with the trainee).

The monitor must be someone who has demonstrated necessary knowledge, skills, and experience (1) by regularly conducting DOT drug test collections for a period of at least a year, (2) by having conducted collector training under this part for a year, or (3) by successfully having completed a "train-the-trainer" course. The Department sets out these alternatives for qualifying as a trainer in response to comments that said "sufficiently knowledgeable" was too vague.

All new collectors must meet these training requirements. In addition, current collectors must meet the requirement within 2½ years after the effective date of this rule (December 2003). This will provide adequate time for current collectors to get the

November 1, 2007



# GAO
**Accountability·Integrity·Reliability**

# Highlights

Highlights of GAO-08-225T, a testimony
before the Subcommittee on Highways
and Transit, Committee on Transportation
and Infrastructure, House of
Representatives

# DRUG TESTING

## Undercover Tests Reveal Significant Vulnerabilities in DOT's Drug Testing Program

## Why GAO Did This Study

To help prevent accidents resulting from drug use by individuals in safety-sensitive positions, the Department of Transportation (DOT) requires motor carriers to conduct drug testing of their employees. These drug tests involve collecting a urine specimen from employees. To ensure the integrity of the urine specimen and the collection process, DOT regulations provide numerous protocols that outline collection procedures and identify controls to prevent employees from defeating a drug test.

Recent media accounts indicate that some sites performing DOT drug test collections may not be adhering to the collection protocols. Moreover, given the different techniques a drug user may employ in an attempt to defeat a drug test, it is possible that a commercial truck driver could defeat a drug test by diluting, substituting, or adulterating a urine specimen in order to obtain a passing result. GAO was asked to perform an undercover operation to determine whether (1) urine collectors followed DOT protocols at selected collection sites and (2) commercially available products could be used to defeat drug tests.

To perform this undercover operation, GAO created two fictitious trucking companies and produced bogus driver's licenses. GAO investigators then posed as truck drivers to test 24 collection sites throughout the United States. GAO briefed DOT officials on its results and they agreed with the findings.

To view the full product, including the scope and methodology, click on GAO-08-225T. For more information, contact Gregory Kutz at (202) 512-6722 or kutzg@gao.gov.

## What GAO Found

DOT's drug testing program is vulnerable to manipulation by drug users, especially given the wide availability of products designed to defeat drug tests. While all urine collection sites followed DOT protocols by asking GAO undercover investigators to provide identification, investigators successfully used bogus driver's licenses to gain access to all 24 sites—demonstrating that a drug user could send someone to take a drug test in their place using fake identification. In addition, 22 of the 24 selected urine collection sites did not adequately follow the remaining protocols GAO tested. For example, 75 percent of the urine collection sites GAO tested failed to restrict access to items that could be used to adulterate or dilute the specimen, meaning that running water, soap, or air freshener was available in the bathroom during the test. The table below provides information about the high failure of selected protocols for the 24 collection sites tested.

**Failure Rates for Selected DOT Protocols GAO Tested**

| Selected DOT urine specimen collection protocol | Percentage of the 24 collection sites that failed |
|---|---|
| Secure the facility from all substances that could be used to adulterate or dilute the specimen | 75 |
| Secure all sources of water in the restroom | 67 |
| Ask the employee to empty his/her pockets and display items to ensure no items are present that could be used to adulterate the specimen | 42 |
| Check the temperature of the specimen | 19 |
| Place a bluing agent in the toilet or secure it with tape | 17 |

Source: GAO.

GAO also found that drug masking products such as adulterants, dilutants, and substitutes were widely available on the Internet. After purchasing drug masking products from Web sites, GAO investigators used adulterants at four of the collection sites and substitute synthetic urine at another four sites without being caught by site collectors—demonstrating that these products could easily be brought into a collection site and used during a test. Even in one case where a collection site followed all DOT collection protocols regarding administration of the test, investigators were still able to substitute synthetic urine for their sample. Every drug masking product went undetected by the drug screening labs. Provided the adulterant GAO used would be able to mask drug use as advertised, a drug user would likely be able to use the substances GAO tested to obtain a passing result on his or her test. According to officials GAO interviewed at the Substance Abuse and Mental Health Services Administration (SAMHSA), companies that make drug-masking products are aware of government test standards and devise products that prevent laboratories from detecting them. SAMHSA is required to provide information to laboratories on how to test the validity of the urine specimens, publicly providing detailed information on lab testing procedures on its Web site.

Addendum p. 27

_____ United States Government Accountability Office

**Federal Aviation Administration, DOT**                               **§ 120.109**

(2) Any fraudulent or intentionally false entry in any record or report that is made, kept, or used to show compliance with this part.

(3) Any reproduction or alteration, for fraudulent purposes, of any report or record required to be kept by this part.

[Doc. No. FAA–2008–0937, 74 FR 22653, May 14, 2009; Amdt. 120–0A, 75 FR 3153, Jan. 20, 2010]

**§ 120.105  Employees who must be tested.**

Each employee, including any assistant, helper, or individual in a training status, who performs a safety-sensitive function listed in this section directly or by contract (including by subcontract at any tier) for an employer as defined in this subpart must be subject to drug testing under a drug testing program implemented in accordance with this subpart. This includes full-time, part-time, temporary, and intermittent employees regardless of the degree of supervision. The safety-sensitive functions are:

(a) Flight crewmember duties.

(b) Flight attendant duties.

(c) Flight instruction duties.

(d) Aircraft dispatcher duties.

(e) Aircraft maintenance and preventive maintenance duties.

(f) Ground security coordinator duties.

(g) Aviation screening duties.

(h) Air traffic control duties.

**§ 120.107  Substances for which testing must be conducted.**

Each employer shall test each employee who performs a safety-sensitive function for evidence of marijuana, cocaine, opiates, phencyclidine (PCP), and amphetamines during each test required by § 120.109.

**§ 120.109  Types of drug testing required.**

Each employer shall conduct the types of testing described in this section in accordance with the procedures set forth in this subpart and the DOT "Procedures for Transportation Workplace Drug Testing Programs" (49 CFR part 40).

(a) *Pre-employment drug testing.* (1) No employer may hire any individual for a safety-sensitive function listed in

§ 120.105 unless the employer first conducts a pre-employment test and receives a verified negative drug test result for that individual.

(2) No employer may allow an individual to transfer from a nonsafety-sensitive to a safety-sensitive function unless the employer first conducts a pre-employment test and receives a verified negative drug test result for the individual.

(3) Employers must conduct another pre-employment test and receive a verified negative drug test result before hiring or transferring an individual into a safety-sensitive function if more than 180 days elapse between conducting the pre-employment test required by paragraphs (a)(1) or (2) of this section and hiring or transferring the individual into a safety-sensitive function, resulting in that individual being brought under an FAA drug testing program.

(4) If the following criteria are met, an employer is permitted to conduct a pre-employment test, and if such a test is conducted, the employer must receive a negative test result before putting the individual into a safety-sensitive function:

(i) The individual previously performed a safety-sensitive function for the employer and the employer is not required to pre-employment test the individual under paragraphs (a)(1) or (2) of this section before putting the individual to work in a safety-sensitive function;

(ii) The employer removed the individual from the employer's random testing program conducted under this subpart for reasons other than a verified positive test result on an FAA-mandated drug test or a refusal to submit to such testing; and

(iii) The individual will be returning to the performance of a safety-sensitive function.

(5) Before hiring or transferring an individual to a safety-sensitive function, the employer must advise each individual that the individual will be required to undergo pre-employment testing in accordance with this subpart, to determine the presence of marijuana, cocaine, opiates, phencyclidine (PCP), and amphetamines, or a metabolite of those drugs

33

## Subpart P - Confidentiality and Release of Information

### § 40.331   To what additional parties must employers and service agents release information?

As an employer or service agent you must release information under the following circumstances:

(a) If you receive a specific, written consent from an employee authorizing the release of information about that employee's drug or alcohol tests to an identified person, you must provide the information to the identified person. For example, as an employer, when you receive a written request from a former employee to provide information to a subsequent employer, you must do so. In providing the information, you must comply with the terms of the employee's consent.

(b) If you are an employer, you must, upon request of DOT agency representatives, provide the following:

(1) Access to your facilities used for this part and DOT agency drug and alcohol program functions.

(2) All written, printed, and computer-based drug and alcohol program records and reports (including copies of name-specific records or reports), files, materials, data, documents/documentation, agreements, contracts, policies, and statements that are required by this part and DOT agency regulations. You must provide this information at your principal place of business in the time required by the DOT agency.

(3) All items in paragraph (b)(2) of this section must be easily accessible, legible, and provided in an organized manner. If electronic records do not meet these standards, they must be converted to printed documentation that meets these standards.

(c) If you are a service agent, you must, upon request of DOT agency representatives, provide the following:

(1) Access to your facilities used for this part and DOT agency drug and alcohol program functions.

(2) All written, printed, and computer-based drug and alcohol program records and reports (including copies of name-specific records or reports), files, materials, data, documents/documentation, agreements, contracts, policies, and statements that are required by this part and DOT agency regulations. You must provide this information at your principal place of business in the time required by the DOT agency.

(3) All items in paragraph (c)(2) of this section must be easily accessible, legible, and provided in an organized manner. If electronic records do not meet these standards, they must be converted to printed documentation that meets these standards.

(d) If requested by the National Transportation Safety Board as part of an accident investigation, you must provide information concerning post-accident tests administered after the accident.

(e) If requested by a Federal, state or local safety agency with regulatory authority over you or the employee, you must provide drug and alcohol test records concerning the employee.

(f) Except as otherwise provided in this part, as a laboratory you must not release or provide a specimen or a part of a specimen to a requesting party, without first obtaining written consent from ODAPC. If a party seeks a court order directing you to release a specimen or part of a specimen contrary to any provision of this part, you must take necessary legal steps to contest the issuance of the order (e.g., seek to quash a subpoena, citing the requirements of §40.13 ). This part does not require you to disobey a court order, however.

(g) Notwithstanding any other provision of this Part, as an employer of Commercial Motor Vehicle (CMV) drivers holding commercial driving licenses (CDLs) or as a third party administrator for owner-operator CMV drivers with CDLs, you are authorized to comply with State laws requiring you to provide to State CDL licensing authorities information about all violations of DOT drug and alcohol testing rules (including positive tests and refusals) by any CMV driver holding a CDL.

[65 FR 79526, Dec. 19, 2000, as amended at 66 FR 41955, Aug. 9, 2001; 73 FR 33737, June 13, 2008]

Addendum p. 29

## DECLARATION OF TONY B. JOBE

I, Tony B. Jobe, declare as follows:

    1.  I am over the age of eighteen and have never been convicted of a felony. I have been a licensed attorney in the State of Louisiana for almost forty (40) years. I have personal knowledge of each fact stated in this declaration.

    2.  On August 11, 2014, I was a participant in a phone conference with Ms. Patrice Kelly, Acting Director of the Office of Drug and Alcohol Policy and Compliance (ODAPC) in the U. S. Department of Transportation; Ms. Anne Bechdolt, at attorney in the Office of Regulation and Enforcement in the U. S. Department of Transportation; and Ms. Nancy Hamilton, a paralegal in the law firm.

    3.  In regards to a laboratory's contact with Ms. Kelly regarding the Order of Florida Circuit Court Judge John Murphy denying Concentra's motion to quash production of the specimen attributed to Mr. Swaters, Ms. Kelly stated that she instructed the counsel for the laboratory to appeal any order to release a sample for DNA testing to the highest court of the jurisdiction based on 49 C.F.R. §40.13.

    4.  Ms. Kelly further told me that, when contacted by a laboratory, she and her staff always instruct them to move to quash any order to produce a urine sample for DNA testing and to use as the basis for the laboratory's refusal that DOT has not consented to the release and federal DOT regulations control this issue.

    5.  Ms. Kelly also represented that ODAPC continues to rely on the Preamble

to 49 C.F.R. Part 40 from 2000 to support its reasoning as to 49 C.F.R. §40.13. According to Ms. Kelly, that regulation prohibits a laboratory from making a urine specimen or part of a urine specimen collected under the auspices of DOT regulations available to the employee who is purportedly the donor. ODAPC maintains that there are no circumstances under which DNA testing would be allowed because there is no need for DNA testing when the chain of custody proves the identity of the specimen.

I declare under penalty of perjury under the laws of the State of Louisiana that the foregoing is true and correct. This declaration was executed on August 21, 2015 in Richmond, Virginia.

Tony B. Jobe
Declarant

Addendum p. 31

## DECLARATION OF NANCY E. HAMILTON

I, Nancy E. Hamilton, declare as follows:

1. I am over the age of eighteen and have never been convicted of a felony. I have provided paralegal services to the Law Offices of Tony B. Jobe since November 1, 2009. I have personal knowledge of each fact stated in this declaration.

2. On August 11, 2014, I was a participant in a phone conference with Ms. Patrice Kelly, Acting Director of the Office of Drug and Alcohol Policy and Compliance (ODAPC) in the U. S. Department of Transportation; Ms. Anne Bechdolt, at attorney in the Office of Regulation and Enforcement in the U. S. Department of Transportation; and Mr. Tony B. Jobe, attorney-at-law.

3. During the course of that phone conference, Ms. Kelly represented that the policy of ODAPC pursuant to 49 C.F.R. § 40.331(f) is that there are no conditions under which the agency will issue written consent for a laboratory to release a specimen or a part of a specimen to a requesting party for non-DOT testing. In regards to the laboratory's contact with ODAPC regarding the court order in Mr. Swaters' Florida state court case, Ms. Kelly stated that because ODAPC had not granted consent to the laboratory for release of the specimen, ODAPC had not provided any written response to the laboratory.

4. Further, Ms. Kelly stated that the policy of ODAPC, when contacted by a

laboratory who has received a court order to release a part of a specimen to a requesting party, is to direct the laboratory to appeal that court order to the highest court of jurisdiction.

5.  Ms. Kelly also represented that ODAPC continues to rely on the Preamble to 49 C.F.R. Part 40 from 2000 to support its reasoning as to 49 C.F.R. §40.13. According to Ms. Kelly, that regulation prohibits a laboratory from making a urine specimen or part of a urine specimen collected under the auspices of DOT regulations available to the employee who is purportedly the donor.  ODAPC maintains that there are no circumstances under which DNA testing would be allowed because there is no need for DNA testing when the chain of custody proves the identity of the donor.

6.  I attended the 2014 Annual Conference of the Drug and Alcohol Testing Industry Association in Phoenix, Arizona on May 28 – 30, 2014.  Based on notes I took contemporaneously with that conference, Ms. Kelly told attendees that when a donor requests that the split specimen be tested to confirm the initial test results, the split specimen was the "half belonging to the donor."

7.  I also attended a session at that same 2014 conference presented by Ms. Margie Rustin, representing the Federal Aviation Administration.  Ms. Rustin informed the group that collection sites are the weakest area of the testing process and that errors by the collection sites resulted in credibility issues in the enforcement

Addendum p. 33

process.    Examples that Ms. Rustin gave of errors the FAA more frequently

encounters include failing to explain procedures to the employee, failing to

accurately complete the chain of custody form or completing the form prior to the

actual test, and failing to use tamper evident tape.

I declare under penalty of perjury under the laws of the State of Louisiana that

the foregoing is true and correct.  This declaration was executed on August 19, 2015

in Richmond, Virginia.

Nancy E. Hamilton
Declarant

## Subpart P - Confidentiality and Release of Information

### § 40.331  To what additional parties must employers and service agents release information?

As an employer or service agent you must release information under the following circumstances:

(a) If you receive a specific, written consent from an employee authorizing the release of information about that employee's drug or alcohol tests to an identified person, you must provide the information to the identified person. For example, as an employer, when you receive a written request from a former employee to provide information to a subsequent employer, you must do so. In providing the information, you must comply with the terms of the employee's consent.

(b) If you are an employer, you must, upon request of DOT agency representatives, provide the following:

(1) Access to your facilities used for this part and DOT agency drug and alcohol program functions.

(2) All written, printed, and computer-based drug and alcohol program records and reports (including copies of name-specific records or reports), files, materials, data, documents/documentation, agreements, contracts, policies, and statements that are required by this part and DOT agency regulations. You must provide this information at your principal place of business in the time required by the DOT agency.

(3) All items in paragraph (b)(2) of this section must be easily accessible, legible, and provided in an organized manner. If electronic records do not meet these standards, they must be converted to printed documentation that meets these standards.

(c) If you are a service agent, you must, upon request of DOT agency representatives, provide the following:

(1) Access to your facilities used for this part and DOT agency drug and alcohol program functions.

(2) All written, printed, and computer-based drug and alcohol program records and reports (including copies of name-specific records or reports), files, materials, data, documents/documentation, agreements, contracts, policies, and statements that are required by this part and DOT agency regulations. You must provide this information at your principal place of business in the time required by the DOT agency.

(3) All items in paragraph (c)(2) of this section must be easily accessible, legible, and provided in an organized manner. If electronic records do not meet these standards, they must be converted to printed documentation that meets these standards.

(d) If requested by the National Transportation Safety Board as part of an accident investigation, you must provide information concerning post-accident tests administered after the accident.

(e) If requested by a Federal, state or local safety agency with regulatory authority over you or the employee, you must provide drug and alcohol test records concerning the employee.

(f) Except as otherwise provided in this part, as a laboratory you must not release or provide a specimen or a part of a specimen to a requesting party, without first obtaining written consent from ODAPC. If a party seeks a court order directing you to release a specimen or part of a specimen contrary to any provision of this part, you must take necessary legal steps to contest the issuance of the order (e.g., seek to quash a subpoena, citing the requirements of §40.13 ). This part does not require you to disobey a court order, however.

(g) Notwithstanding any other provision of this Part, as an employer of Commercial Motor Vehicle (CMV) drivers holding commercial driving licenses (CDLs) or as a third party administrator for owner-operator CMV drivers with CDLs, you are authorized to comply with State laws requiring you to provide to State CDL licensing authorities information about all violations of DOT drug and alcohol testing rules (including positive tests and refusals) by any CMV driver holding a CDL.

[65 FR 79526, Dec. 19, 2000, as amended at 66 FR 41955, Aug. 9, 2001; 73 FR 33737, June 13, 2008]

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

JEFFREY R. SWATERS,

               Petitioner,

v.

OCCUPATIONAL HEALTH CARE
OF FLORIDA, INC. d/b/a:
CONCENTRA MEDICAL CENTERS,

               Respondent.

_____/

CASE NO.:  10-13086 (21)

JUDGE:    JOHN J. MURPHY

**ORDER DENYING DEFENDANT, OCCUPATIONAL HEALTH CARE
OF FLORIDA, INC. d/b/a CONCENTRA MEDICAL CENTERS'
OBJECTION TO PLAINTIFF'S NOTICE OF PRODUCTION FROM
NON-PARTY AS TO DSI LABORATORIES AND MOTION TO QUASH
SUBPOENA DUCES TECUM**

      **THIS CAUSE** comes before the Court upon Defendant, Occupational Health Care of Florida, Inc. d/b/a Concentra Medical Centers' Objection to Plaintiff's Notice of Production From Non-Party as to DSI Laboratories and Motion to Quash Subpoena Duces Tecum .

      This Court, having considered the motion, applicable law, the court file, and being otherwise fully advised in the premises, accordingly, it is

      **ORDERED AND ADJUDGED** that Defendant, Occupational Health Care of Florida, Inc. d/b/a Concentra Medical Centers' Objection to Plaintiff's Notice of Production From Non-Party as to DSI Laboratories and Motion to Quash Subpoena Duces Tecum is **DENIED,**

      **DONE AND ORDERED** on this $10$ day of October 2012, in Chambers, Fort Lauderdale, Broward County, Florida.

_____
JOHN J. MURPHY, III
CIRCUIT COURT JUDGE

CC:   Frederick E. Hasty, III, Esq.
       Michael J. Ferrin, Esq.

TRUE COPY
JUDGE JOHN J. MURPHY, III

**Appendix Ex. 13**

Addendum p. 36

## Subpart B - Employer Responsibilities

### § 40.13   How do DOT drug and alcohol tests relate to non-DOT tests?

(a) DOT tests must be completely separate from non-DOT tests in all respects.

(b) DOT tests must take priority and must be conducted and completed before a non-DOT test is begun. For example, you must discard any excess urine left over from a DOT test and collect a separate void for the subsequent non-DOT test.

(c) Except as provided in paragraph (d) of this section, you must not perform any tests on DOT urine or breath specimens other than those specifically authorized by this part or DOT agency regulations. For example, you may not test a DOT urine specimen for additional drugs, and a laboratory is prohibited from making a DOT urine specimen available for a DNA test or other types of specimen identity testing.

(d) The single exception to paragraph (c) of this section is when a DOT drug test collection is conducted as part of a physical examination required by DOT agency regulations. It is permissible to conduct required medical tests related to this physical examination (e.g., for glucose) on any urine remaining in the collection container after the drug test urine specimens have been sealed into the specimen bottles.

(e) No one is permitted to change or disregard the results of DOT tests based on the results of non-DOT tests. For example, as an employer you must not disregard a verified positive DOT drug test result because the employee presents a negative test result from a blood or urine specimen collected by the employee's physician or a DNA test result purporting to question the identity of the DOT specimen.

(f) As an employer, you must not use the CCF or the ATF in your non-DOT drug and alcohol testing programs. This prohibition includes the use of the DOT forms with references to DOT programs and agencies crossed out. You also must always use the CCF and ATF for all your DOT-mandated drug and alcohol tests.

## Subpart B - Employer Responsibilities

### § 40.27  May an employer require an employee to sign a consent or release in connection with the DOT drug and alcohol testing program?

No, as an employer, you must not require an employee to sign a consent, release, waiver of liability, or indemnification agreement with respect to any part of the drug or alcohol testing process covered by this part (including, but not limited to, collections, laboratory testing, MRO and SAP services). [66 FR 41950, Aug. 9, 2001]

**Subpart F - Drug Testing Laboratories**

**§ 40.99  How long does the laboratory retain specimens after testing?**

(a) As a laboratory testing the primary specimen, you must retain a specimen that was reported with positive, adulterated, substituted, or invalid results for a minimum of one year.

(b) You must keep such a specimen in secure, long-term, frozen storage in accordance with HHS requirements.

(c) Within the one-year period, the MRO, the employee, the employer, or a DOT agency may request in writing that you retain a specimen for an additional period of time (e.g., for the purpose of preserving evidence for litigation or a safety investigation). If you receive such a request, you must comply with it. If you do not receive such a request, you may discard the specimen at the end of the year.

(d) If you have not sent the split specimen to another laboratory for testing, you must retain the split specimen for an employee's test for the same period of time that you retain the primary specimen and under the same storage conditions.

(e) As the laboratory testing the split specimen, you must meet the requirements of paragraphs (a) through (d) of this section with respect to the split specimen.

Addendum p. 39

**§91.17   Alcohol or drugs.**

(a) No person may act or attempt to act as a crewmember of a civil aircraft—

(1) Within 8 hours after the consumption of any alcoholic beverage;

(2) While under the influence of alcohol;

(3) While using any drug that affects the person's faculties in any way contrary to safety; or

(4) While having an alcohol concentration of 0.04 or greater in a blood or breath specimen. Alcohol concentration means grams of alcohol per deciliter of blood or grams of alcohol per 210 liters of breath.

(b) Except in an emergency, no pilot of a civil aircraft may allow a person who appears to be intoxicated or who demonstrates by manner or physical indications that the individual is under the influence of drugs (except a medical patient under proper care) to be carried in that aircraft.

(c) A crewmember shall do the following:

(1) On request of a law enforcement officer, submit to a test to indicate the alcohol concentration in the blood or breath, when—

(i) The law enforcement officer is authorized under State or local law to conduct the test or to have the test conducted; and

(ii) The law enforcement officer is requesting submission to the test to investigate a suspected violation of State or local law governing the same or substantially similar conduct prohibited by paragraph (a)(1), (a)(2), or (a)(4) of this section.

(2) Whenever the FAA has a reasonable basis to believe that a person may have violated paragraph (a)(1), (a)(2), or (a)(4) of this section, on request of the FAA, that person must furnish to the FAA the results, or authorize any clinic, hospital, or doctor, or other person to release to the FAA, the results of each test taken within 4 hours after acting or attempting to act as a crewmember that indicates an alcohol concentration in the blood or breath specimen.

(d) Whenever the Administrator has a reasonable basis to believe that a person may have violated paragraph (a)(3) of this section, that person shall, upon request by the Administrator, furnish the Administrator, or authorize any clinic, hospital, doctor, or other person to release to the Administrator, the results of each test taken within 4 hours after acting or attempting to act as a crewmember that indicates the presence of any drugs in the body.

(e) Any test information obtained by the Administrator under paragraph (c) or (d) of this section may be evaluated in determining a person's qualifications for any airman certificate or possible violations of this chapter and may be used as evidence in any legal proceeding under section 602, 609, or 901 of the Federal Aviation Act of 1958.

[Doc. No. 18334, 54 FR 34292, Aug. 18, 1989, as amended by Amdt. 91-291, June 21, 2006]

FAR section 121.455 (14 C.F.R. Part 121) as codified at the time of Mr. Swaters'
FAA enforcement action stated in relevant part:

§ 121.455 Use of prohibited drugs.

* * * * * (b) No certificate holder or operator may knowingly use any person to
perform, nor may any person perform for a certificate holder or operator, either
directly or by contract, any function listed in appendix I to this part while that
person has a prohibited drug, as defined in that appendix, in his or her system.

* * * * *

§ 821.31                                        49 CFR Ch. VIII (10–1–07 Edition)

not be so stayed during the pendency of the appeal.

§ 821.31  Complaint procedure.

(a) *Filing, time of filing and service on respondent.* The order of the Administrator from which an appeal has been taken shall serve as the complaint. The Administrator shall (except as provided in § 821.55(a) with respect to emergency proceedings) file the complaint with the Board within 10 days after the date on which he or she was served with the appeal by the respondent, and shall simultaneously serve a copy of the complaint on the respondent. If the Administrator has determined that the respondent lacks qualification to be a certificate holder, the order filed as the complaint, or an accompanying statement, shall identify the pleaded factual allegations on which this determination is based.

(b) *Answer to complaint.* The respondent shall (except as provided in § 821.55(b) with respect to emergency proceedings) file with the Board an answer to the complaint within 20 days after the date on which the complaint was served by the Administrator, and shall simultaneously serve a copy of the answer on the Administrator. Failure by the respondent to deny the truth of any allegation or allegations in the complaint may be deemed an admission of the truth of the allegation or allegations not answered. The answer shall also identify any affirmative defenses that the respondent intends to raise at the hearing. The answer may be amended to include affirmative defenses in accordance with the provisions of § 821.12(a).

§ 821.32  Burden of proof.

In proceedings under 49 U.S.C. 44709, the burden of proof shall be upon the Administrator.

§ 821.33  Motion to dismiss stale complaint.

Where the complaint states allegations of offenses which occurred more than 6 months prior to the Administrator's advising the respondent as to reasons for proposed action under 49 U.S.C. 44709(c), the respondent may move to dismiss such allegations as stale pursuant to the following provisions:

(a) In those cases where the complaint does not allege lack of qualification of the respondent:

(1) The Administrator shall be required to show, by reply filed within 15 days after the date of service of the respondent's motion, that good cause existed for the delay in providing such advice, or that the imposition of a sanction is warranted in the public interest, notwithstanding the delay or the reasons therefor.

(2) If the Administrator does not establish good cause for the delay, or for the imposition of a sanction in the public interest notwithstanding the delay, the law judge shall dismiss the stale allegations and proceed to adjudicate the remaining portion of the complaint, if any.

(b) In those cases where the complaint alleges lack of qualification of the respondent, the law judge shall first determine whether an issue of lack of qualification would be presented if all of the allegations, stale and timely, are assumed to be true. If so, the law judge shall deny the respondent's motion. If not, the law judge shall proceed as in paragraph (a) of this section.

Subpart E—Law Judges

§ 821.35  Assignment, duties and powers.

(a) *Assignment of law judge and duration of assignment.* The chief law judge shall assign a law judge to preside over each proceeding. Until such assignment, motions, requests and documents shall be addressed to the Case Manager for handling by the chief law judge, who may handle these matters personally or delegate them to other law judges for decision. After assignment of a proceeding to a law judge, all motions, requests and documents shall be addressed to that law judge. The authority of the assigned law judge shall terminate upon the expiration of the period within which appeals from initial decisions or appealable orders may be filed, or upon the law judge's withdrawal from the proceeding.

(b) *Powers of law judge.* Law judges shall have the following powers:

170

**National Transportation Safety Board**    **§ 821.40**

(1) To give notice of, and to hold, prehearing conferences and hearings, and to consolidate proceedings which involve a common question of law or fact;

(2) To hold conferences, before or during the hearing, for the settlement or simplification of issues;

(3) To issue subpoenas, and to take depositions or cause depositions to be taken;

(4) To dispose of procedural requests or similar matters;

(5) To rule on motions;

(6) To regulate the conduct of hearings;

(7) To administer oaths and affirmations;

(8) To examine witnesses;

(9) To receive evidence and rule upon objections and offers of proof; and

(10) To issue initial decisions.

(c) *Disqualification.* A law judge shall withdraw from a proceeding if, at any time, he or she deems himself or herself disqualified. If the law judge does not withdraw, and if an appeal from the law judge's initial decision is filed, the Board will, on motion of a party, determine whether the law judge should have withdrawn and, if so, order appropriate relief.

## Subpart F—Hearing

### § 821.37  Notice of hearing.

(a) *Time and location of hearing.* The law judge to whom the proceeding is assigned (or the chief judge) shall set a reasonable date, time and place for the hearing. Except as provided with respect to emergency proceedings in § 821.56(a), a written notice of hearing shall be served on the parties at least 30 days in advance of the hearing. The law judge may set the hearing for a date fewer than 30 days after the date of the issuance of the notice of hearing if all of the parties consent to an earlier hearing date. In setting the date of the hearing, due regard shall be given to the parties' discovery needs. In setting the place of the hearing, due regard shall be given to the location of the subject incident, the convenience of the parties and their witnesses, and the conservation of Board funds. Another relevant factor in determining the place of the hearing is the conven-ience of the hearing site to scheduled transportation service. Only in the most extraordinary circumstances may consideration be given to locating a hearing in a foreign country.

(b) *Hearing in several sessions.* Where appropriate, the law judge may hold a hearing in more than one session, at the same or different locations.

### § 821.38  Evidence.

Each party shall have the right to present a case-in-chief, or defense, by oral and documentary evidence, to submit evidence in rebuttal, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. Hearsay evidence (including hearsay within hearsay, where there are acceptable circumstantial indicia of trustworthiness) shall be admissible. All material and relevant evidence should be admitted, but the law judge may exclude unduly repetitious evidence.

### § 821.39  Argument and submissions.

At the hearing, the law judge shall give the parties adequate opportunity for the presentation of arguments in support of, or in opposition to, motions, objections and proposed rulings. Prior to the issuance of the initial decision, the parties shall be afforded a reasonable opportunity to submit for consideration proposed findings and conclusions, and supporting reasons therefor.

### § 821.40  Record.

The transcript of testimony and exhibits, together with all papers, requests and rulings filed in the proceeding before the law judge, shall constitute the exclusive record of the proceeding. Copies of the transcript may be obtained by any party upon payment of the reasonable cost thereof. A copy of the transcript may be examined at the National Transportation Safety Board, Office of Administrative Law Judges, Public Docket Section.

Addendum p. 43

ity of 49:106(g). In clauses (1) and (2), the word "overhaul" is omitted as surplus. In clause (1), the words "course of" are omitted as surplus. In clause (3), the words "in his opinion" are omitted as surplus.

AIRCRAFT REPAIR AND MAINTENANCE ADVISORY PANEL

Pub. L. 106–181, title VII, §734, Apr. 5, 2000, 114 Stat. 170, provided that:

"(a) ESTABLISHMENT OF PANEL.—The Administrator [of the Federal Aviation Administration]—

"(1) shall establish an aircraft repair and maintenance advisory panel to review issues related to the use and oversight of aircraft and aviation component repair and maintenance facilities (in this section referred to as 'aircraft repair facilities') located within, or outside of, the United States; and

"(2) may seek the advice of the panel on any issue related to methods to increase safety by improving the oversight of aircraft repair facilities.

"(b) MEMBERSHIP.—The panel shall consist of—

"(1) nine members appointed by the Administrator as follows:

"(A) three representatives of labor organizations representing aviation mechanics;

"(B) one representative of cargo air carriers;

"(C) one representative of passenger air carriers;

"(D) one representative of aircraft repair facilities;

"(E) one representative of aircraft manufacturers;

"(F) one representative of on-demand passenger air carriers and corporate aircraft operations; and

"(G) one representative of regional passenger air carriers;

"(2) one representative from the Department of Commerce, designated by the Secretary of Commerce;

"(3) one representative from the Department of State, designated by the Secretary of State; and

"(4) one representative from the Federal Aviation Administration, designated by the Administrator.

"(c) RESPONSIBILITIES.—The panel shall—

"(1) determine the amount and type of work that is being performed by aircraft repair facilities located within, and outside of, the United States; and

"(2) provide advice and counsel to the Secretary [of Transportation] with respect to the aircraft and aviation component repair work performed by aircraft repair facilities and air carriers, staffing needs, and any balance of trade or safety issues associated with that work.

"(d) DOT TO REQUEST INFORMATION FROM AIR CARRIERS AND REPAIR FACILITIES.—

"(1) COLLECTION OF INFORMATION.—The Secretary, by regulation, shall require air carriers, foreign air carriers, domestic repair facilities, and foreign repair facilities to submit such information as the Secretary may require in order to assess balance of trade and safety issues with respect to work performed on aircraft used by air carriers, foreign air carriers, United States corporate operators, and foreign corporate operators.

"(2) DRUG AND ALCOHOL TESTING INFORMATION.—Included in the information the Secretary requires under paragraph (1) shall be information on the existence and administration of employee drug and alcohol testing programs in place at the foreign repair facilities, if applicable. The Secretary, if necessary, shall work with the International Civil Aviation Organization to increase the number and improve the administration of employee drug and alcohol testing programs at the foreign repair facilities.

"(3) DESCRIPTION OF WORK DONE.—Included in the information the Secretary requires under paragraph (1) shall be information on the amount and type of work performed on aircraft registered in and outside of the United States.

"(e) DOT TO FACILITATE COLLECTION OF INFORMATION ABOUT AIRCRAFT MAINTENANCE.—The Secretary shall facilitate the collection of information from the National Transportation Safety Board, the Federal Avia-

tion Administration, and other appropriate agencies regarding maintenance performed by aircraft repair facilities.

"(f) DOT TO MAKE INFORMATION AVAILABLE TO PUBLIC.—The Secretary shall make any relevant information received under subsection (d) available to the public, consistent with the authority to withhold trade secrets or commercial, financial, and other proprietary information under section 552 of title 5, United States Code.

"(g) TERMINATION.—The panel established under subsection (a) shall terminate on the earlier of—

"(1) the date that is 2 years after the date of the enactment of this Act [Apr. 5, 2000]; or

"(2) December 31, 2001.

"(h) DEFINITIONS.—The definitions contained in section 40102 of title 49, United States Code, shall apply to this section."

## §44708. Inspecting and rating air navigation facilities

The Administrator of the Federal Aviation Administration may inspect, classify, and rate an air navigation facility available for the use of civil aircraft on the suitability of the facility for that use.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1190.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 44708 .......... | 49 App.:1426 (1st sentence). | Aug. 23, 1958, Pub. L. 85–726, §606 (1st sentence), 72 Stat. 779. |
| | 49 App.:1655(c)(1). | Oct. 15, 1966, Pub. L. 89–670, §6(c)(1), 80 Stat. 938; Jan. 12, 1983, Pub. L. 97–449, §7(b), 96 Stat. 2444. |

The word "Administrator" in section 606 (1st sentence) of the Federal Aviation Act of 1958 (Public Law 85–726, 72 Stat. 779) is retained on authority of 49:106(g).

## §44709. Amendments, modifications, suspensions, and revocations of certificates

(a) REINSPECTION AND REEXAMINATION.—The Administrator of the Federal Aviation Administration may reinspect at any time a civil aircraft, aircraft engine, propeller, appliance, design organization, production certificate holder, air navigation facility, or air agency, or reexamine an airman holding a certificate issued under section 44703 of this title.

(b) ACTIONS OF THE ADMINISTRATOR.—The Administrator may issue an order amending, modifying, suspending, or revoking—

(1) any part of a certificate issued under this chapter if—

(A) the Administrator decides after conducting a reinspection, reexamination, or other investigation that safety in air commerce or air transportation and the public interest require that action; or

(B) the holder of the certificate has violated an aircraft noise or sonic boom standard or regulation prescribed under section 44715(a) of this title; and

(2) an airman certificate when the holder of the certificate is convicted of violating section 13(a) of the Fish and Wildlife Act of 1956 (16 U.S.C. 742j–1(a)).

(c) ADVICE TO CERTIFICATE HOLDERS AND OPPORTUNITY TO ANSWER.—Before acting under

subsection (b) of this section, the Administrator shall advise the holder of the certificate of the charges or other reasons on which the Administrator relies for the proposed action. Except in an emergency, the Administrator shall provide the holder an opportunity to answer the charges and be heard why the certificate should not be amended, modified, suspended, or revoked.

(d) APPEALS.—(1) A person adversely affected by an order of the Administrator under this section may appeal the order to the National Transportation Safety Board. After notice and an opportunity for a hearing, the Board may amend, modify, or reverse the order when the Board finds—

(A) if the order was issued under subsection (b)(1)(A) of this section, that safety in air commerce or air transportation and the public interest do not require affirmation of the order; or

(B) if the order was issued under subsection (b)(1)(B) of this section—

(i) that control or abatement of aircraft noise or sonic boom and the public health and welfare do not require affirmation of the order; or

(ii) the order, as it is related to a violation of aircraft noise or sonic boom standards and regulations, is not consistent with safety in air commerce or air transportation.

(2) The Board may modify a suspension or revocation of a certificate to imposition of a civil penalty.

(3) When conducting a hearing under this subsection, the Board is not bound by findings of fact of the Administrator but is bound by all validly adopted interpretations of laws and regulations the Administrator carries out and of written agency policy guidance available to the public related to sanctions to be imposed under this section unless the Board finds an interpretation is arbitrary, capricious, or otherwise not according to law.

(e) EFFECTIVENESS OF ORDERS PENDING APPEAL.—

(1) IN GENERAL.—When a person files an appeal with the Board under subsection (d), the order of the Administrator is stayed.

(2) EXCEPTION.—Notwithstanding paragraph (1), the order of the Administrator is effective immediately if the Administrator advises the Board that an emergency exists and safety in air commerce or air transportation requires the order to be effective immediately.

(3) REVIEW OF EMERGENCY ORDER.—A person affected by the immediate effectiveness of the Administrator's order under paragraph (2) may petition for a review by the Board, under procedures promulgated by the Board, of the Administrator's determination that an emergency exists. Any such review shall be requested not later than 48 hours after the order is received by the person. If the Board finds that an emergency does not exist that requires the immediate application of the order in the interest of safety in air commerce or air transportation, the order shall be stayed, notwithstanding paragraph (2). The Board shall dispose of a review request under this paragraph not later than 5 days after the date on which the request is filed.

(4) FINAL DISPOSITION.—The Board shall make a final disposition of an appeal under subsection (d) not later than 60 days after the date on which the appeal is filed.

(f) JUDICIAL REVIEW.—A person substantially affected by an order of the Board under this section, or the Administrator when the Administrator decides that an order of the Board under this section will have a significant adverse impact on carrying out this part, may obtain judicial review of the order under section 46110 of this title. The Administrator shall be made a party to the judicial review proceedings. Findings of fact of the Board are conclusive if supported by substantial evidence.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1190; Pub. L. 106–181, title VII, §716, Apr. 5, 2000, 114 Stat. 162; Pub. L. 108–176, title II, §227(c), Dec. 12, 2003, 117 Stat. 2532.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 44709(a) ...... | 49 App.:1429(a) (1st sentence). | Aug. 23, 1958, Pub. L. 85–726, §609(a) (1st–7th sentences, 8th–last sentences less Administrator under title VII), 72 Stat. 779; Nov. 18, 1971, Pub. L. 92–159, §2(a), 85 Stat. 481; Nov. 27, 1971, Pub. L. 92–174, §6, 85 Stat. 492; Aug. 26, 1992, Pub. L. 102–345, §3(a)(1), 106 Stat. 925. |
| | 49 App.:1655(c)(1). | Oct. 15, 1966, Pub. L. 89–670, §6(c)(1), 80 Stat. 938; Jan. 12, 1983, Pub. L. 97–449, §7(b), 96 Stat. 2444. |
| 44709(b) ...... | 49 App.:1429(a) (2d sentence). | |
| | 49 App.:1429(b). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §609(b); added Nov. 18, 1971, Pub. L. 92–159, §2(a), 85 Stat. 481. |
| | 49 App.:1431(e) (words before 4th comma). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §611(e); added July 21, 1968, Pub. L. 90–411, §1, 82 Stat. 395; restated Oct. 27, 1972, Pub. L. 92–574, §7(b), 86 Stat. 1241. |
| 44709(c) ...... | 49 App.:1655(c)(1). | |
| | 49 App.:1429(a) (3d sentence). | |
| | 49 App.:1431(e) (words between 4th and 5th commas). | |
| 44709(d)(1) .. | 49 App.:1655(c)(1). | |
| | 49 App.:1429(a) (4th sentence). | |
| | 49 App.:1431(e) (words after 4th comma). | |
| 44709(d)(2) .. | 49 App.:1429(a) (6th sentence). | |
| 44709(d)(3) .. | 49 App.:1429(a) (5th sentence). | |
| | 49 App.:1655(c)(1). | |
| 44709(e) ...... | 49 App.:1429(a) (7th sentence). | |
| | 49 App.:1655(c)(1). | |
| 44709(f) ...... | 49 App.:1429(a) (8th–last sentences less Administrator under subch. VII). | |
| | 49 App.:1655(c)(1). | |

In this section, the word "Administrator" in section 609(a) of the Federal Aviation Act of 1958 (Public Law 85–726, 72 Stat. 779) is retained on authority of 49:106(g). The words "modifying", "modify", and "modified" are omitted as surplus.

In subsection (a), the words "airman holding a certificate issued under section 44703 of this title" are substituted for "civil airman" for clarity.

In subsection (b)(1), before subclause (A), the words "certificate issued under this chapter" are substituted

§ 821.37

## Subpart F—Hearing

### § 821.37  Notice of hearing.

(a) *Time and location of hearing.* The law judge to whom the proceeding is assigned (or the chief judge) shall set a reasonable date, time and place for the hearing. Except as provided with respect to emergency proceedings in § 821.56(a), a written notice of hearing shall be served on the parties at least 30 days in advance of the hearing. The law judge may set the hearing for a date fewer than 30 days after the date of the issuance of the notice of hearing if all of the parties consent to an earlier hearing date. In setting the date of the hearing, due regard shall be given to the parties' discovery needs. In setting the place of the hearing, due regard shall be given to the location of the subject incident, the convenience of the parties and their witnesses, and the conservation of Board funds. Another relevant factor in determining the place of the hearing is the convenience of the hearing site to scheduled transportation service. Only in the most extraordinary circumstances may consideration be given to locating a hearing in a foreign country.

(b) *Hearing in several sessions.* Where appropriate, the law judge may hold a hearing in more than one session, at the same or different locations.

### § 821.38  Evidence.

Each party shall have the right to present a case-in-chief, or defense, by oral and documentary evidence, to submit evidence in rebuttal, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. Hearsay evidence (including hearsay within hearsay, where there are acceptable circumstantial indicia of trustworthiness) shall be admissible. All material and relevant evidence should be admitted, but the law judge may exclude unduly repetitious evidence.

### § 821.39  Argument and submissions.

At the hearing, the law judge shall give the parties adequate opportunity for the presentation of arguments in support of, or in opposition to, motions, objections and proposed rulings. Prior to the issuance of the initial de-

cision, the parties shall be afforded a reasonable opportunity to submit for consideration proposed findings and conclusions, and supporting reasons therefor.

### § 821.40  Record.

The transcript of testimony and exhibits, together with all papers, requests and rulings filed in the proceeding before the law judge, shall constitute the exclusive record of the proceeding. Copies of the transcript may be obtained by any party upon payment of the reasonable cost thereof. A copy of the transcript may be examined at the National Transportation Safety Board, Office of Administrative Law Judges, Public Docket Section.

## Subpart G—Initial Decision

### § 821.42  Initial decision by law judge.

(a) *Written or oral decision.* The law judge may render his or her initial decision orally at the close of the hearing, or in writing at a later date, except as provided with respect to emergency proceedings in § 821.56(c).

(b) *Content.* The initial decision shall include findings and conclusions upon all material issues of fact, credibility of witnesses, law and discretion presented on the record, together with a statement of the reasons therefor.

(c) *Furnishing parties with, and issuance date of, oral decision.* If the initial decision is rendered orally, a copy thereof, excerpted from the hearing transcript, shall be furnished to the parties by the Office of Administrative Law Judges. Irrespective of the date on which the copy of the decision is transmitted to the parties, the issuance date of the decision shall be the date on which it was orally rendered.

### § 821.43  Effect of law judge's initial decision or appealable order and appeal therefrom.

If no appeal from the law judge's initial decision or appealable order is timely filed, the initial decision or order shall become final with respect to the parties, but shall not be binding precedent for the Board. The filing of a timely notice of appeal with the Board shall stay the effectiveness of the law judge's initial decision or order, unless

162

**National Transportation Safety Board** §821.50

for such objections, including any legal precedent relied upon in support thereof.

(3) Any error contained in the initial decision which is not objected to in the appeal brief may be deemed waived.

(c) *Reply brief.* Any other party to the proceeding may file a brief in reply to the appeal brief within 30 days after the date on which the appeal brief was served on that party (except as provided in §821.57(b) with respect to emergency proceedings). A copy of the reply brief shall simultaneously be served on the appealing party and any other parties to the proceeding. The form requirements governing the appeal brief set forth in paragraph (b)(1) also apply to the reply brief.

(d) *Other filings.* Subsequent to the filing of the appeal and reply briefs, the parties may file citations to supplemental authorities. This procedure may be used only for identifying new and relevant legal authority, and not to correct omissions in briefing or to respond to a reply brief. No argument may be included with such a filing. Such filing shall include a reference to the page of the brief to which the cited legal authority pertains. Any response shall be filed within 10 days of the date of service of the supplemental filing, and shall be similarly limited in scope. With these exceptions, the parties may make no other submissions, except by leave of the Board, upon on a showing of good cause.

(e) *Oral argument.* Oral argument before the Board will not be held in proceedings under this part unless the Board, on motion of a party or on its own initiative, determines that oral argument is needed.

§821.49  Issues on appeal.

(a) On appeal, the Board will consider only the following issues:

(1) Are the findings of fact each supported by a preponderance of reliable, probative and substantial evidence?

(2) Are conclusions made in accordance with law, precedent and policy?

(3) Are the questions on appeal substantial?

(4) Have any prejudicial errors occurred?

(b) If the Board determines that the law judge erred in any respect, or that

his or her initial decision or order should be changed, the Board may make any necessary findings and may issue an order in lieu of the law judge's initial decision or order, or may remand the proceeding for any such purpose as the Board may deem necessary.

§821.50  Petition for rehearing, reargument, reconsideration or modification of an order of the Board.

(a) *General.* Any party to a proceeding may petition the Board for rehearing, reargument, reconsideration or modification of a Board order on appeal from a law judge's initial decision or order. An initial decision or appealable order of a law judge that has become final because no timely appeal was taken therefrom may not be the subject of a petition under this section.

(b) *Timing and service.* The petition must be filed with the Board, and simultaneously served on the other parties, within 30 days after the date of service of the Board's order on appeal from the law judge's initial decision or order.

(c) *Content.* The petition shall state briefly and specifically the matters of record alleged to have been erroneously decided, and the ground or grounds relied upon. If the petition is based, in whole or in part, upon new matter, it shall set forth such new matter and shall contain affidavits of prospective witnesses, authenticated documents, or both, or an explanation of why such substantiation is unavailable, and shall explain why such new matter could not have been discovered in the exercise of due diligence prior to the date on which the evidentiary record closed.

(d) *Repetitious petitions.* Repetitious petitions will not be entertained by the Board, and will be summarily dismissed.

(e) *Reply to petition.* Any other party to the proceeding may file a reply to the petition within 15 days after the date on which the petition was served on that party. A copy of such reply shall simultaneously be served on the petitioner and any other parties to the proceeding.

(f) *Stay of effective date of Board's order.* The filing of a petition under this section shall operate to stay the

173

Addendum p. 47

§ 821.52                                    **49 CFR Ch. VIII (10–1–07 Edition)**

effective date of the Board's order, unless the Board directs otherwise.

## Subpart I—Special Rules Applicable to Proceedings Involving Emergency and Other Immediately Effective Orders

### § 821.52   General.

(a) *Applicability.* This subpart shall apply to any order issued by the Administrator under 49 U.S.C. 44709 as an emergency order, as an order not designated as an emergency order but later amended to be an emergency order, and any order designated as immediately effective or effective immediately.

(b) *Effective date of emergency.* The procedure set forth herein shall apply as of the date on which written advice of the emergency character of the Administrator's order is received and docketed by the Board.

(c) *Computation of time.* Time shall be computed in accordance with the provisions of § 821.10.

(d) *Waiver.* Except as provided in § 821.54(f), or where the law judge or the Board determines that it would unduly burden another party or the Board, a certificate holder (respondent) affected by an emergency or other immediately effective order of the Administrator may, at any time after filing an appeal from such an order, waive the applicability of the accelerated time limits of this subpart; however, such a waiver shall not serve to lengthen any period of time for doing an act prescribed by this subpart which expired before the date on which the waiver was made.

### § 821.53   Appeal.

(a) *Time within which to file appeal.* An appeal from an emergency or other immediately effective order of the Administrator must be filed within 10 days after the date on which the Administrator's order was served on the respondent. The respondent shall simultaneously serve a copy of the appeal on the Administrator. .

(b) *Form and content of appeal.* The appeal may be in letter form. It shall identify the certificate or certificates affected and indicate that an emergency or other immediately effective

order of the Administrator is being appealed.

### § 821.54   Petition for review of Administrator's determination of emergency.

(a) *Time within which to file petition.* A respondent may, within 2 days after the date of receipt of an emergency or other immediately effective order of the Administrator, file with the Board a petition for review of the Administrator's determination that an emergency, requiring the order to be effective immediately, exists. This 2-day time limit is statutory and the Board has no authority to extend it. If the respondent has not previously filed an appeal from the Administrator's emergency or other immediately effective order, the petition shall also be considered a simultaneously filed appeal from the order under § 821.53.

(b) *Form, content and service of petition.* The petition may be in letter form. A copy of the Administrator's order, from which review of the emergency determination is sought, must be attached to the petition. If a copy of the order is not attached, the petition will be dismissed. While the petition need only request that the Board review the Administrator's determination as to the existence of an emergency requiring the order be effective immediately, it may also enumerate the respondent's reasons for believing that the Administrator's emergency determination is not warranted in the interest of aviation safety. The petition must be filed with the Board by overnight delivery service or facsimile and simultaneously served on the Administrator by the same means.

(c) *Reply to petition.* If the petition enumerates the respondent's reasons for believing that the Administrator's emergency determination is unwarranted, the Administrator may, within 2 days after the date of service of the petition, file a reply, which shall be strictly limited to matters of rebuttal. Such reply must be filed with the Board by overnight delivery service or facsimile and simultaneously served on the respondent by the same means. No submissions other than the respondent's petition and the Administrator's

174

Addendum p. 48

USCA Case #14-1277    Document #1569440    Filed: 08/24/2015    Page 52 of 62

Committee on Commerce, Science, and Transportation of the Senate."

Pub. L. 106–424, §6(b), Nov. 1, 2000, 114 Stat. 1886, provided that: "Not later than 1 year after the date of the enactment of this Act [Nov. 1, 2000], the National Transportation Safety Board and the Federal Bureau of Investigation shall revise their 1977 agreement on the investigation of accidents to take into account the amendments made by this Act [see Short Title of 2000 Amendment note set out under section 1101 of this title]."

### MEMORANDUM OF UNDERSTANDING

Pub. L. 106–424, §8, Nov. 1, 2000, 114 Stat. 1886, provided that: "Not later than 1 year after the date of the enactment of this Act [Nov. 1, 2000], the National Transportation Safety Board and the United States Coast Guard shall revise their Memorandum of Understanding governing major marine accidents—

"(1) to redefine or clarify the standards used to determine when the National Transportation Safety Board will lead an investigation; and

"(2) to develop new standards to determine when a major marine accident involves significant safety issues relating to Coast Guard safety functions."

### § 1132. Civil aircraft accident investigations

(a) GENERAL AUTHORITY.—(1) The National Transportation Safety Board shall investigate—

(A) each accident involving civil aircraft; and

(B) with the participation of appropriate military authorities, each accident involving both military and civil aircraft.

(2) A person employed under section 1113(b)(1) of this title that is conducting an investigation or hearing about an aircraft accident has the same authority to conduct the investigation or hearing as the Board.

(b) NOTIFICATION AND REPORTING.—The Board shall prescribe regulations governing the notification and reporting of accidents involving civil aircraft.

(c) PARTICIPATION OF SECRETARY.—The Board shall provide for the participation of the Secretary of Transportation in the investigation of an aircraft accident under this chapter when participation is necessary to carry out the duties and powers of the Secretary. However, the Secretary may not participate in establishing probable cause.

(d) ACCIDENTS INVOLVING ONLY MILITARY AIRCRAFT.—If an accident involves only military aircraft and a duty of the Secretary is or may be involved, the military authorities shall provide for the participation of the Secretary. In any other accident involving only military aircraft, the military authorities shall give the Board or Secretary information the military authorities decide would contribute to the promotion of air safety.

(Pub. L. 103–272, §1(d), July 5, 1994, 108 Stat. 753.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 1132(a)(1) .... | 49 App.:1441(a)(2). | Aug. 23, 1958, Pub. L. 85–726, §§701(a)(1), (2), (c) (1st sentence), (g), 702, 72 Stat. 782. |
| | 49 App.:1442(a). | |
| | 49 App.:1655(d) (1st sentence). | Oct. 15, 1966, Pub. L. 89–670, §6(d) (1st sentence), 80 Stat. 938. |

HISTORICAL AND REVISION NOTES—CONTINUED

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| | 49 App.:1903(a)(1)(A). | Jan. 3, 1975, Pub. L. 93–633, §304(a)(1)(A), 88 Stat. 2168. |
| 1132(a)(2) .... | 49 App.:1441(c) (1st sentence). | |
| | 49 App.:1655(d) (1st sentence). | |
| | 49 App.:1903(a)(1)(A). | |
| 1132(b) ........ | 49 App.:1441(a)(1). | |
| | 49 App.:1655(d) (1st sentence). | |
| | 49 App.:1903(a)(1)(A). | |
| 1132(c) ........ | 49 App.:1441(g). | |
| | 49 App.:1655(c)(1). | Oct. 15, 1966, Pub. L. 89–670, §6(c)(1), 80 Stat. 938; Jan. 12, 1983, Pub. L. 97–449, §7(b), 96 Stat. 2444. |
| | 49 App.:1655(d) (1st sentence). | |
| | 49 App.:1903(a)(1)(A). | |
| 1132(d) ........ | 49 App.:1442(b), (c). | |
| | 49 App.:1655(c)(1), (d) (1st sentence). | |
| | 49 App.:1903(a)(1)(A). | |

In subsection (a)(1)(A), the words "and report the facts, conditions, and circumstances related to each accident and the probable cause thereof" in 49 App.:1441(a)(2) are omitted as unnecessary because of section 1131(d) of the revised title.

In subsection (a)(1)(B), the words "provide for" in 49 App.:1442(a) are omitted as surplus.

In subsection (a)(2), the words "any member of the National Transportation Safety Board or any officer or employee of the National Transportation Safety Board" in 49 App.:1441(c) are omitted as unnecessary because of sections 1113 and 1134 of the revised title.

In subsections (c) and (d), the words "Secretary of Transportation" and "Secretary" are substituted for "Administrator" in sections 701(g) and 702(b) and (c) of the Federal Aviation Act of 1958 (Public Law 85–726, 72 Stat. 782) for consistency. Section 6(c)(1) of the Department of Transportation Act (Public Law 89–670, 80 Stat. 938) transferred all duties and powers of the Federal Aviation Agency and the Administrator to the Secretary of Transportation. However, the Secretary was to carry out certain provisions through the Administrator. In addition, various laws enacted since then have vested duties and powers in the Administrator. All provisions of law the Secretary is required to carry out through the Administrator are included in 49:106(g).

In subsection (c), the words "and his representatives" in 49 App.:1441(g) are omitted because of 49:322(b). The words "when participation is necessary to carry out the duties and powers" are substituted for "In order to assure the proper discharge . . . of his duties and responsibilities" to eliminate unnecessary words. The words "or his representatives" are omitted because of 49:322(b).

### § 1133. Review of other agency action

The National Transportation Safety Board shall review on appeal—

(1) the denial, amendment, modification, suspension, or revocation of a certificate issued by the Secretary of Transportation under section 44703, 44709, or 44710 of this title;

(2) the revocation of a certificate of registration under section 44106 of this title;

(3) a decision of the head of the department in which the Coast Guard is operating on an appeal from the decision of an administrative law judge denying, revoking, or suspending a license, certificate, document, or register in a proceeding under section 6101, 6301, or 7503, chapter 77, or section 9303 of title 46; and

(4) under section 46301(d)(5) of this title, an order imposing a penalty under section 46301.

(Pub. L. 103–272, §1(d), July 5, 1994, 108 Stat. 754.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 1133(1)–(3) ... | 49 App.:1903(a)(9). | Jan. 3, 1975, Pub. L. 93–633, §304(a)(3), 88 Stat. 2169; Oct. 19, 1984, Pub. L. 98–499, §4(b), 98 Stat. 2315. |
| 1133(4) ........ | (no source). | |

In clause (1), the word "certificate" is substituted for "operating certificate" for consistency in the revised title. The words "or license" are omitted as unnecessary because only certificates are issued under the sections cited in this section.

In clause (3), the words "head of the department in which the Coast Guard is operating" are substituted for "Commandant of the Coast Guard" for consistency with 14:5 and 46:2101(34).

Clause (4) is added to reflect all the appellate responsibilities of the National Transportation Safety Board.

TRANSFER OF FUNCTIONS

For transfer of authorities, functions, personnel, and assets of the Coast Guard, including the authorities and functions of the Secretary of Transportation relating thereto, to the Department of Homeland Security, and for treatment of related references, see sections 468(b), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

§ 1134. Inspections and autopsies

(a) ENTRY AND INSPECTION.—An officer or employee of the National Transportation Safety Board—

(1) on display of appropriate credentials and written notice of inspection authority, may enter property where a transportation accident has occurred or wreckage from the accident is located and do anything necessary to conduct an investigation; and

(2) during reasonable hours, may inspect any record, process, control, or facility related to an accident investigation under this chapter.

(b) INSPECTION, TESTING, PRESERVATION, AND MOVING OF AIRCRAFT AND PARTS.—(1) In investigating an aircraft accident under this chapter, the Board may inspect and test, to the extent necessary, any civil aircraft, aircraft engine, propeller, appliance, or property on an aircraft involved in an accident in air commerce.

(2) Any civil aircraft, aircraft engine, propeller, appliance, or property on an aircraft involved in an accident in air commerce shall be preserved, and may be moved, only as provided by regulations of the Board.

(c) AVOIDING UNNECESSARY INTERFERENCE AND PRESERVING EVIDENCE.—In carrying out subsection (a)(1) of this section, an officer or employee may examine or test any vehicle, vessel, rolling stock, track, or pipeline component. The examination or test shall be conducted in a way that—

(1) does not interfere unnecessarily with transportation services provided by the owner or operator of the vehicle, vessel, rolling stock, track, or pipeline component; and

(2) to the maximum extent feasible, preserves evidence related to the accident, consistent with the needs of the investigation and with the cooperation of that owner or operator.

(d) EXCLUSIVE AUTHORITY OF BOARD.—Only the Board has the authority to decide on the way in which testing under this section will be conducted, including decisions on the person that will conduct the test, the type of test that will be conducted, and any individual who will witness the test. Those decisions are committed to the discretion of the Board. The Board shall make any of those decisions based on the needs of the investigation being conducted and, when applicable, subsections (a), (c), and (e) of this section.

(e) PROMPTNESS OF TESTS AND AVAILABILITY OF RESULTS.—An inspection, examination, or test under subsection (a) or (c) of this section shall be started and completed promptly, and the results shall be made available.

(f) AUTOPSIES.—(1) The Board may order an autopsy to be performed and have other tests made when necessary to investigate an accident under this chapter. However, local law protecting religious beliefs related to autopsies shall be observed to the extent consistent with the needs of the accident investigation.

(2) With or without reimbursement, the Board may obtain a copy of an autopsy report performed by a State or local official on an individual who died because of a transportation accident investigated by the Board under this chapter.

(Pub. L. 103–272, § 1(d), July 5, 1994, 108 Stat. 754.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 1134(a) ........ | 49 App.:1903(b)(2) (1st sentence words before 3d comma, 3d sentence). | Jan. 3, 1975, Pub. L. 93–633, §304(b)(2), 88 Stat. 2170; Nov. 3, 1981, Pub. L. 97–74, §5, 95 Stat. 1065; Nov. 28, 1990, Pub. L. 101–641, §3, 104 Stat. 4654. |
| 1134(b) ........ | 49 App.:1441(c) (2d sentence), (d). | Aug. 23, 1958, Pub. L. 85–726, §701(c) (2d, last sentences), (d), 72 Stat. 781; Oct. 15, 1962, Pub. L. 87–810, §§1, 2, 76 Stat. 921. |
| | 49 App.:1655(d) (1st sentence). | Oct. 15, 1966, Pub. L. 89–670, §6(d) (1st sentence), 80 Stat. 938. |
| | 49 App.:1903(a)(1)(A). | Jan. 3, 1975, Pub. L. 93–633, §304(a)(1)(A), (b)(5), 88 Stat. 2168, 2170. |
| 1134(c) ........ | 49 App.:1903(b)(2) (1st sentence words after 3d comma, 2d sentence). | |
| 1134(d) ........ | 49 App.:1903(b)(2) (5th, last sentences). | |
| 1134(e) ........ | 49 App.:1903(b)(2) (4th sentence). | |
| 1134(f) ........ | 49 App.:1441(c) (last sentence). 49 App.:1655(d) (1st sentence). 49 App.:1903(a)(1)(A), (b)(5). | |

In subsection (a), before clause (1), the word "officer" is added for consistency in the revised title.

In subsection (b)(1), the words "investigating an aircraft accident" are substituted for "carrying out its duties" in 49 App.:1441(c) for clarity. The words "inspect and test" are substituted for "examine and test" for consistency in the revised title and with other titles of the United States Code.

In subsection (c), before clause (1), the words "In carrying out subsection (a)(1) of this section, an officer or employee" are added because of the restatement. The words "or any part of any such item" are omitted as surplus. The words "when such examination or testing is determined to be required for purposes of such inves-

# 49 U.S. Code § 1153 - Judicial review

- **US Code**
- **Notes**
- **Authorities (CFR)**

prev | next

**(a) General.—** The appropriate court of appeals of the United States or the United States Court of Appeals for the District of Columbia Circuit may review a final order of the National Transportation Safety Board under this chapter. A person disclosing a substantial interest in the order may apply for review by filing a petition not later than 60 days after the order of the Board is issued.

**(b) Persons Seeking Judicial Review of Aviation Matters.—**

**(1)** A person disclosing a substantial interest in an order related to an aviation matter issued by the Board under this chapter may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60 days only if there was a reasonable ground for not filing within that 60–day period.

**(2)** When a petition is filed under paragraph (1) of this subsection, the clerk of the court immediately shall send a copy of the petition to the Board. The Board shall file with the court a record of the proceeding in which the order was issued.

**(3)** When the petition is sent to the Board, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Board to conduct further proceedings. After reasonable notice to the Board, the court may grant interim relief by staying the order or taking other appropriate action when cause for its action exists. Findings of fact by the Board, if supported by substantial evidence, are conclusive.

**(4)** In reviewing an order under this subsection, the court may consider an objection to an order of the Board only if the objection was made in the proceeding conducted by the Board or if there was a reasonable ground for not making the objection in the proceeding.

**(5)** A decision by a court under this subsection may be reviewed only by the Supreme Court under section 1254 of title 28.

**(c) Administrator Seeking Judicial Review of Aviation Matters.—** When the Administrator of the Federal Aviation Administration decides that an order of the Board under section 44703 (d), 44709, or46301 (d)(5) of this title will have a significant adverse impact on carrying out this chapter related to an aviation matter, the Administrator may obtain judicial review of the order under section 46110of this title. The Administrator shall be made a party to the judicial review proceedings. Findings of fact of the Board are conclusive if supported by substantial evidence.

**(d) Commandant Seeking Judicial Review of Maritime Matters.—** If the Commandant of the Coast Guard decides that an order of the Board issued pursuant to a review of a Coast

Guard action under section 1133 of this title will have an adverse impact on maritime safety or security, the Commandant may obtain judicial review of the order under subsection (a). The Commandant, in the official capacity of the Commandant, shall be a party to the judicial review proceedings.

US DOT/ODAPC is responsible for interpretation of regulations

49 CFR Part 40

Laboratory has Common Law Duty of Ordinary Care to All Individuals Undergoing Drug Testing

Laboratory must follow regulations when conducting DOT drug test

Pilot submits to random drug testing

Laboratory reports failed test to Employer

Pilot believes laboratory mislabeled specimen

Employer reports failed test to FAA

Pilot sues Laboratory in Florida State Court - Tort Claim

FAA issues Emergency Revocation Order

Pilot files Notice of Production on Non-Party Laboratory

Pilot appeals Order to NTSB ALJ

Laboratory files Motion to Quash citing 49 CFR 40.13

ALJ Upholds FAA Decision

District Judge entered Order Denying Motion to Quash

Pilot Appeals ALJ Decision to the full NTSB

Laboratory contacts ODAPC for consent and reports to the FL 4th DCA that ODAPC refuses to grant consent

Laboratory Appeals to Florida 4th DCA

NTSB Affirms Decision of the ALJ

Pilot seeks permission from ODAPC and seeks Agency

FL 4th DCA Quashed Order

Pilot Appeals NTSB Decision to US Court of Appeals for the Eleventh Circuit

DOT 11/24/14 Decision

Pilot files Petition for Review with Florida Supreme Court

Eleventh Circuit Upholds Decision of the NTSB

Pilot files this Petition for Review with CADC

FL Supreme Court declines Jurisdiction

# 5

# Descriptions of Some Forensic Science Disciplines

This chapter describes the methods of some of the major forensic science disciplines. It focuses on those that are used most commonly for investigations and trials as well as on those that have been cause for concern in court or elsewhere because their reliability has not been sufficiently established in a systematic (scientific) manner in accordance with the principles discussed in Chapter 4. The chapter focuses primarily on the forensic science disciplines' capability for providing evidence that can be presented in court. As such, there is considerable discussion about the reliability and precision of results—attributes that factor into probative value and admissibility decisions. It should be recalled, however, that forensic science also provides great value to law enforcement investigations, and even those forensic science disciplines whose scientific foundation is currently limited might have the capacity (or the potential) to provide probative information to advance a criminal investigation.[1] This chapter also provides the committee's summary assessment of each of these disciplines.[2]

---

[1] For example, forensic odontology might not be sufficiently grounded in science to be admissible under *Daubert*, but this discipline might be able to reliably exclude a suspect, thereby enabling law enforcement to focus its efforts on other suspects. And forensic science methods that do not meet the standards of admissible evidence might still offer leads to advance an investigation.

[2] The chapter does not discuss eyewitness identification or line-ups, because these techniques do not normally rely on forensic scientists for analysis or implementation. They clearly are of major importance for investigations and trials, and their effective use and interpretation relies on scientific knowledge and continuing research. For similar reasons, this chapter does not delve into the polygraph. The validity of polygraph testing for security screening was addressed

127

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward

Because forensic science aims to glean information from a wide variety of clues and evidence associated with a crime, it deals with a broad range of tools and with evidence of highly variable quality. In general, the forensic science disciplines are pragmatic, with practitioners adopting, adapting, or developing whatever tools and technological aids they can to distill useful information from crime scene evidence. Many forensic science methods have been developed in response to such evidence—combining experience-based knowledge with whatever relevant science base exists in order to create a procedure that returns useful information. Although some of the techniques used by the forensic science disciplines—such as DNA analysis, serology, forensic pathology, toxicology, chemical analysis, and digital and multimedia forensics—are built on solid bases of theory and research, many other techniques have been developed heuristically. That is, they are based on observation, experience, and reasoning without an underlying scientific theory, experiments designed to test the uncertainties and reliability of the method, or sufficient data that are collected and analyzed scientifically.

In the course of its deliberations, the committee received testimony from experts in many forensic science disciplines concerning current practices, validity, reliability and errors, standards, and research.[3] From this testimony and from many written submissions, as well as from the personal experiences of the committee members, the committee developed the consensus views presented in this chapter.

## BIOLOGICAL EVIDENCE

Biological evidence is provided by specimens of a biological origin that are available in a forensic investigation. Such specimens may be found at the scene of a crime or on a person, clothing, or weapon. Some—for example, pet hairs, insects, seeds, or other botanical remnants—come from the crime scene or from an environment through which a victim or suspect has recently traversed. Other biological evidence comes from specimens obtained directly from the victim or suspect, such as blood, semen, saliva, vaginal secretions, sweat, epithelial cells, vomitus, feces, urine, hair, tissue, bones, and microbiological and viral agents. The most common types of biological evidence collected for examination are blood, semen, and saliva. Human biological evidence that contains nuclear DNA can be particularly valuable because the possibility exists to associate that evidence with one individual with a degree of reliability that is acceptable for criminal justice.

---

in National Research Council, Committee to Review the Scientific Evidence on the Polygraph. 2003. *The Polygraph and Lie Detection*. Washington, DC: The National Academies Press. It does not cover forensic pathology, because that field is addressed in Chapter 9.

[3] A complete list of those who provided testimony to the committee is included in Appendix B.

Addendum p. 55

Copyright © National Academy of Sciences. All rights reserved.

## Sample Data and Collection

At the crime scene, biological evidence is located, documented, collected, and preserved for subsequent analysis in the crime laboratory. Locating and recognizing biological evidence can be more difficult than a layperson would presume. For example, blood is not always red, some red substances are not blood, and most biological evidence, such as saliva or semen, is not readily visible. Crime scene investigators locate biological evidence through tests that screen for the presence of a particular biological fluid (e.g., blood, semen, saliva), and investigators have a choice of techniques.[4] For blood they might use an alternate light source (ALS) at 415nm, the wavelength under which bloodstains absorb light and are thus more visible to the naked eye. Most commonly, though, the screening test for blood is a catalytic chemical test that turns color or luminesces in the presence of blood. Scene investigators may also use Luminol, fluorescein, or crystal violet to identify areas at the scene where attempts were made to clean a bloody crime scene.

These tests for blood may also locate other evidence that should be collected and taken to the laboratory for analysis. Recently, immunological tests that can identify human hemoglobin or glycophorin A have become available. These are blood-specific proteins that can be demonstrated to be of human origin. At some point in the future, these immunological tests may replace standard chemical tests, and, although more expensive, they are more specific because they identify blood conclusively instead of just presumptively. Investigators also have several techniques for locating semen at the crime scene. Commonly they rely on an ALS, under which semen, other biological fluids, and some other evidence will luminesce. More recently, immunological tests can be used to identify seminal plasma proteins, for example, prostate specific antigen (p30 or PSA) or semenogelin.[5]

Finding saliva at the scene is mostly happenstance. Although it luminesces with the ALS at specific wavelengths, the glow is not as strong, and a weaker ALS light source may not highlight it well and possibly not at all. Thus, it can be easily missed. Screening tests for saliva are chemical tests that identify amylase, an enzyme occurring in high concentrations in saliva. But the screening is not definitive, because other types of tissue also

---

[4] Interpreting the results of any screening test requires expertise and experience. Many crime scene investigators have the requisite experience, but they may lack a scientific background, and it is not always straightforward to correctly interpret the results of screening tests. Crime scene investigations that require science-based screening tools are most reliable if someone is involved who understands the physics and chemistry of those tools.

[5] I. Sato, M. Sagi, A. Ishiwari, H. Nishijima, E. Ito, and T. Mukai. 2002. Use of the "SMITEST" PSA card to identify the presence of prostate-specific antigen in semen and male urine. *Forensic Science International* 127(1-2):71-74.

Addendum p. 56

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward

contain amylase, including the particular type (AMY 1) that is associated with saliva.

## Analyses

Although the forensic use of nuclear DNA is barely 20 years old, DNA typing is now universally recognized as the standard against which many other forensic individualization techniques are judged. DNA enjoys this preeminent position because of its reliability and the fact that, absent fraud or an error in labeling or handling, the probabilities of a false positive are quantifiable and often miniscule. However, even a very small (but nonzero) probability of false positive can affect the odds that a suspect is the source of a sample with a matching DNA profile.[6] The scientific bases and reliability of other types of biological analysis are also well established, but absent nuclear DNA, they can only narrow the field of suspects, not suggest any particular individual.

Testing biological evidence in the laboratory involves the use of a logical sequence of analyses designed to identify what a substance is and then from whom it came. The sequence begins with a forensic biologist locating the substance on the evidence. This is followed by a presumptive test that would give more information about the substance, typically using the same tests employed by scene investigators: the ALS, enzymatic, chemical, or immunological tests. Once the material (e.g., blood, semen, or saliva) is known, an immunological test or a human DNA test is run to determine whether the sample comes from a human or an animal.

The final step in the analytical sequence procedure is to identify the source of the biological material. If a sufficient sample is present and is probative, the forensic biologist prepares the material for DNA testing. The analyst who conducts the DNA test may or may not be the same person who examines the original physical evidence, depending on laboratory policies.

A decision might be required regarding the type of DNA testing to employ. Two primary types of DNA tests are conducted in U.S. forensic laboratories: nuclear testing and mitochondrial DNA (mtDNA) testing, with several variations of the former. For most biological evidence having evidentiary significance, forensic DNA laboratories employ nuclear testing routinely,[7] and testing for the 13 core Short Tandem Repeat (STR)

---

[6] W.C. Thompson, F. Taroni, and C.G.G. Aitken. 2003. How the probability of a false positive affects the value of DNA evidence. *Journal of Forensic Sciences* 48(1):47-54.

[7] T.R. Moretti, A.L. Baumstark, D.A. Defenbaugh, K.M. Keys, J.B. Smerick, and B. Budowle B. 2001. Validation of short tandem repeats (STRs) for forensic usage: Performance testing of fluorescent multiplex STR systems and analysis of authentic and simulated forensic samples. *Journal of Forensic Sciences* 46(3):647-660.

Addendum p. 57

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward
USCA Case #14-1277     Document #1569440     Filed: 08/24/2015     Page 61 of 62

*FORENSIC SCIENCE DISCIPLINES*                                    *131*

polymorphisms is the first line of attack.[8] The results are entered into the Federal Bureau of Investigation's (FBI's) Combined DNA Indexing System (CODIS) and are searched against DNA profiles already in one of three databases: a convicted felon database, a forensic database containing DNA profiles from crime scenes, and a database of DNA from unidentified persons.

Sometimes the evidence dictates testing just for Y STRs, which assesses only the Y (male) chromosome. In sexual assaults for which only small amounts of male nuclear DNA are available (e.g., a large excess of vaginal DNA), it is possible to obtain a Y STR profile of the male who left the semen. Unlike the 13 core loci used in CODIS searches, where a match of all 13 is a strong indicator that both samples come from the same individual, Y STR testing is not as definitive with respect to identifying a single person. A third nuclear test involves the analysis of single nucleotide polymorphisms (SNPs). Although no public forensic DNA laboratory in the United States is routinely analyzing forensic evidence for SNPs, the utility of this genomic information for cases in which the DNA is too damaged to allow standard testing has garnered attention since its use in the World Trade Center identification effort.[9]

If insufficient nuclear DNA is present for STR testing, or if the existing nuclear DNA is degraded, two options potentially are available. One technique amplifies the amount of DNA available, although this technique is not widely available in U.S. forensic laboratories. A second alternative is to sequence mitochondrial DNA (mtDNA). Since 1996, it has been possible to compare single-source crime scene samples and samples from the victim or defendant on the basis of mtDNA. Four FBI-supported mtDNA laboratories and a few private mtDNA laboratories conduct DNA casework. This technique has been particularly helpful with regard to hairs—which do not contain enough nuclear DNA to enable analysis with current methods unless the root is present—and bones and teeth. Because it measures only a single locus of the genome, mtDNA analysis is much less discriminating than nuclear DNA analysis; all people with a common female ancestor (within the past few generations) share a common profile. But mtDNA testing has forensic value in its ability to include or exclude an individual as its source.

Laboratories entering the results of forensic DNA testing into CODIS must meet specific quality guidelines, which include the requirement that

---

[8] Some laboratories are now using 16 loci, 13 of which are the original core loci.

[9] B. Leclair, R. Shaler, G.R. Carmody, K. Eliason, B.C.Hendrickson, T. Judkins, M.J. Norton, C. Sears, and T. Scholl. 2007. Bioinformatics and human identification in mass fatality incidents: The World Trade Center disaster. *Journal of Forensic Sciences* 52(4):806-819. Epub May 25, 2007.

Addendum p. 58

Copyright © National Academy of Sciences. All rights reserved.

*132*    *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

the laboratory be accredited and that specific procedures be in place and followed. In accredited laboratories, forensic DNA personnel must take proficiency tests and must meet specific educational and training requirements. (See Chapter 8 for further discussion.) Laboratory analyses are conducted by scientists with degrees ranging from a bachelor's degree in science to a doctoral degree. Each forensic DNA laboratory has a technical leader, who normally must meet additional experience and educational requirements.

Although DNA laboratories are expected to conduct their examinations under stringent quality controlled environments, errors do occasionally occur. They usually involve situations in which interpretational ambiguities occur or in which samples were inappropriately processed and/or contaminated in the laboratory. Errors also can occur when there are limited amounts of DNA, which limits the amount of test information and increases the chance of misinterpretation. Casework reviews of mtDNA analysis suggest a wide range in the quality of testing results that include contamination, inexperience in interpreting mixtures, and differences in how a test is conducted.[10]

### Reporting of Results

FBI quality guidelines require that reports from forensic DNA analysis must contain, at a minimum, a description of the evidence examined, a listing of the loci analyzed, a description of the methodology, results and/or conclusions, and an interpretative statement (either quantitative or qualitative) concerning the inference to be drawn from the analysis.[11]

---

[10] Personal communication, Terry Melton, Mitotyping Laboratory. December 2007. See also L. Prieto; A. Alonso; C. Alves; M. Crespillo; M. Montesino; A. Picornell; A. Brehm; J.L. Ramirez; M.R. Whittle; M.J. Anjos; I. Boschi; J. Buj; M. Cerezo; S. Cardoso; R. Cicarelli; D. Comas; D. Corach; C. Doutremepuich; R.M. Espinheira; I. Fernandez-Fernandez; S. Filippini; Julia Garcia-Hirschfeld; A. Gonzalez; B. Heinrichs; A. Hernandez; F.P.N. Leite; R.P. Lizarazo; A.M. Lopez-Parra; M. Lopez-Soto; J.A. Lorente; B. Mechoso; I. Navarro; S. Pagano; J.J. Pestano; J. Puente; E. Raimondi; A. Rodriguez-Quesada; M.F. Terra-Pinheiro; L. Vidal-Rioja; C. Vullo; A. Salas. 2008. GEP-ISFG collaborative exercise on mtDNA: Reflections about interpretation, artefacts and DNA mixtures. *Forensic Science International: Genetics* 2(2):126-133; and A. Salas, L. Prieto, M. Montesino, C. Albarrán, E. Arroyo, M. Paredes-Herrera, A. Di Lonardo, C. Doutremepuich, I. Fernández-Fernández, A. de la Vega. 2005. Mitochondrial DNA error prophylaxis: Assessing the causes of errors in the GEP'02-03 proficiency testing trial. *Forensic Science International* 148(2-3):191-198.

[11] DNA Advisory Board. 2000. Quality assurance standards for forensic DNA testing laboratories. *Forensic Science Communications* 2(3). Available at www.bioforensics.com/conference04/TWGDAM/Quality_Assurance_Standards_2.pdf.

Addendum p. 59

Copyright © National Academy of Sciences. All rights reserved.